W. B. DAVIS & SON, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 21. Promulgated December 10, 1945.

*Charles A. Noone, Esq.*, for the petitioner.
*Charles P. Bagley, Esq.*, for the respondent.

1196

1198

1200

OPINION.

TYSON, *Judge*: The first and second issues herein concern the invention of Robert E. Davis relating to the automatic top machine and processes and the royalty payments received by the petitioner under the patent license granted to Interwoven and dated July 1, 1935. The first issue is whether the petitioner is entitled to deduct in the years 1939 and 1940, as ordinary and necessary business expenses, amounts equal to one-fourth of the royalties received in 1939 and 1940, which amounts it claims it became obligated to pay in those years to Charles A. Noone, trustee, under the resolution of its directors of November 8, 1935. The second issue is whether the royalties received by the petitioner in 1940 are abnormal income within the meaning of section 721 of the Internal Revenue Code, and whether, under the provisions of that section, the petitioner is entitled to exclude $8,511.44 of such royalty income from its excess profits net income of the year 1940. The third issue is whether the petitioner is entitled to deduct in the year 1940, for obsolescence, or as a loss from abandonment, the sum of $8,049.55 representing the depreciated cost, less salvage value, of the 62 Fidelity machines described in the findings of fact. We consider the issues in the order as stated.

(1) *Business expenses.*—The petitioner claims deductions for the years 1939 and 1940 on account of the agreement contained in the reso-

lution of its board of directors of November 8, 1935, to pay to Davis or the trustee one cent a dozen from the royalty of four cents a dozen to be received by it from Interwoven under the patent license agreement of July 1, 1935.[1] The respondent held in determining the deficiencies (and it is his position here) that the payments to be made under the agreement of November 8, 1935, constituted the consideration for Davis' interest in the inventions and patent rights and that they were capital expenditures. The petitioner opposes this view on the ground that it did not acquire a capital asset or strengthen its title to any property by virtue of its agreement to make the payments to Davis or the trustee, and it insists that the payments were nothing more than payments to settle Davis' unfounded claim of an interest in the patent rights and to avoid threatened litigation which would be detrimental to its business, and that, as such, they are deductible as ordinary and necessary business expenses.

The amounts claimed as deductions were not paid during the taxable years, and it is not clear from the record that any liability to pay such amounts accrued during the taxable years. However, we need not concern ourselves with the matter of accrual. We are of the opinion that the payments were expenditures for the acquisition of Davis' inventions and patent rights, and our conclusion in this regard requires disallowance of the deductions even though liability to pay had accrued during the taxable years.

The petitioner advances two theories in support of its contention that it did not acquire a capital asset by virtue of the payments to be made under the resolution of November 8, 1935. The first is that it owned the inventions and patent rights prior to the assignment by Davis, by reason of the fact that Davis made the inventions while he was in the petitioner's employ and while he was receiving a salary and using the petitioner's facilities and the services of other of its employees in perfecting the inventions. The second is that petitioner acquired the inventions and patent rights through the assignment by Davis prior to and independently of its agreement to pay him or the trustee a part of the Interwoven royalties.

With respect to the petitioner's first theory, the pertinent facts are: That the inventions embodied the ideas of Davis alone; that Davis used the facilities of the petitioner and the services of other of its employees in working out his ideas; that at the time when he made the inventions Davis was under a general contract of employment as an officer of the petitioner, receiving compensation for his services, and

---

[1] In its pleadings the petitioner claims deductions of $6,748.67 for 1939 and $7,449.65 for 1940. One-fourth of the royalty receipts is $6,692.51, for 1939 and $8,354.31 for 1940. The petitioner concedes that, on the proof, the deduction for 1939 should be limited to $6,692.51, and, with respect to 1940, it seeks to deduct only the amount claimed in the petition, namely $7,449.65.

did not have any contract or understanding to make the inventions; and that he did not, at any time prior to the assignment of 1935, have any contract or other understanding with the petitioner obligating him to assign to it his rights in the inventions or patent applications. Under these facts, it is our opinion that the petitioner did not acquire title to the inventions and patent applications prior to the assignment by Davis. It acquired nothing more than a nonexclusive right to practice the inventions, otherwise called a "shop right," but the inventions remained the property of Davis, and he was entitled to the patents and could exclude all others than the petitioner from the practice or use of the inventions. *United States* v. *Dubilier Condenser Corporation*, 289 U. S. 178, and authorities cited therein; *Johnson Furnace & Engineering Co.* v. *Western Furnace Co.*, 178 Fed. 819. The applicable principle is stated in the *Dubilier* case as follows:

One employed to make an invention, who succeeds, during his term of service, in accomplishing that task, is bound to assign to his employer any patent obtained. The reason is that he has only produced that which he was employed to invent. His invention is the precise subject of the contract of employment. A term of the agreement necessarily is that what he is paid to produce belongs to his paymaster. *Standard Parts Co.* v. *Peck*, 264 U. S. 52. On the other hand, if the employment be general, albeit it cover a field of labor and effort in the performance of which the employee conceived the invention for which he obtained a patent, the contract is not so broadly construed as to require an assignment of the patent. * * *

* * * Recognition of the nature of the act of invention also defines the limits of the so-called shop-right, which shortly stated, is that where a servant, during his hours of employment, working with his master's materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master a non-exclusive right to practice the invention. * * * This is an application of equitable principles. Since the servant uses his master's time, facilities and materials to attain a concrete result, the latter is in equity entitled to use that which embodies his own property and to duplicate it as often as he may find occasion to employ similar appliances in his business. But the employer in such a case has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it, together with the right conferred by the patent, to exclude all others than the employer from the accruing benefits.

The second theory of the petitioner, namely, that it acquired the inventions and patent rights through the assignment by Davis prior to and independently of its agreement to pay him or the trustee a part of the royalties, is likewise untenable.

We think the minutes of the meeting of petitioner's board of directors of November 8, 1935, clearly show that the $1,250 cash agreed to be paid to Davis and the portion of the royalties agreed to be paid the trustee to be used by him in discharging the indebtedness of Davis and his deceased father (as shown by the resolution passed at that meeting) was in consideration of Davis' assignment of the inventions and appli-

cations for patent to petitioner. The statements made to that meeting by Davis and petitioner's attorney, who was also chairman of its executive committee, show that, while the negotiations for the contract with Interwoven were being had in New York, it was required that the assignment be made in order to consummate that contract; that Davis then believed the inventions and applications to be his, and was assured by the executive committee that payments would be made in the amounts and in the manner afterwards set out in the resolution of the board of directors at its meeting on November 8, 1935. The memorandum contract entered into by petitioner with Interwoven dated July 1, 1935, was not approved and ratified by the petitioner's board of directors until the meeting of November 8, 1935. The assignment of Davis to petitioner bore date of June 29, 1935, but was not acknowledged until the 25th day of September, 1935. That assignment recited the consideration moving to Davis to be "the sum of One Dollar to me paid and other valuable considerations." We think that the "other valuable considerations" consisted of the agreement to pay the $1,250 cash to Davis and to pay the one-fourth part of the royalties to be received from Interwoven to the trustee, as recited in the resolution of November 8, 1935.

The assignment, the approval of the license agreement, the agreement to pay Davis $1,250, the agreement to pay the trustee part of the royalties to be received from Interwoven, in our opinion, were all consummated as part of a single plan to have petitioner own the patents and grant the license, and we think the agreement to make such payment was made, as expressly stated in the resolution, "in full payment of any and all right, title, and interest that R. E. Davis had or has in and to certain inventions and improvements," those inventions being the ones here involved. The payments which the petitioner agreed to make to the trustee and which are claimed as deductions under this issue were clearly capital expenditures made to acquire the inventions and patent rights, and not a business expense.

Moreover, even if the agreement had been made in order to prevent Davis from attacking the assignment through litigation, the payments would come within the category of expenditures to protect the petitioner's title. As such they would not be allowable as ordinary and necessary business expenses. Regulations 103, § 19.24–2; *Moynier* v. *Welch*, 97 Fed. (2d) 471; *Murphy Oil Co.* v. *Burnet*, 55 Fed. (2d) 17; affd., 287 U. S. 299; *Chestnut Farms Dairy, Inc.*, 19 B. T. A. 192; affd., 63 Fed. (2d) 129; *Morgan Jones Estate*, 43 B. T. A. 691; affd., 127 Fed. (2d) 231; *E. B. Elliott Co.*, 45 B. T. A. 82.

The action of the respondent in disallowing the deductions claimed under the first issue is approved.

(2) *Abnormality of income.*—This issue arises under section 721 of the Internal Revenue Code, which grants relief to taxpayers having

abnormalities in income in the taxable period.   That section was first incorporated as part of the code by the Excess Profits Tax Act of 1940 (Second Revenue Act of 1940, sec. 201) and it has since been amended by the Excess Profits Tax Amendments of 1941 (sec. 5) and by the Revenue Act of 1942 (sec. 221).   The section, as so amended, applies to taxable years beginning after December 31, 1939.   Its provisions as amended, in so far as they are here material, are set forth in the margin.[2]

---

[2] SEC. 721. ABNORMALITIES IN INCOME IN TAXABLE PERIOD.

(a) DEFINITIONS.—For the purposes of this section—

(1) ABNORMAL INCOME.—The term "abnormal income" means income of any class includible in the gross income of the taxpayer for any taxable year under this subchapter if it is abnormal for the taxpayer to derive income of such class, or, if the taxpayer normally derives income of such class but the amount of such income of such class includible in the gross income of the taxable year is in excess of 125 per centum of the average amount of the gross income of the same class for the four previous taxable years, * * *

(2) SEPARATE CLASSES OF INCOME.—Each of the following subparagraphs shall be held to describe a separate class of income :

(A) Income arising out of a claim, award, judgment, or decree, or interest on any of the foregoing ; or

(B) Income constituting an amount payable under a contract the performance of which required more than 12 months ; or

(C) Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents, formulae, or processes, or any combination of the foregoing, extending over a period of more than 12 months ; or

(D) Income includible in gross income for the taxable year rather than for a different taxable year by reason of a change in the taxpayer's accounting period or method of accounting ; or

(E) In the case of a lessor of real property, income included in gross income for the taxable year by reason of the termination of the lease ; or

(F) Income consisting of dividends on stock of foreign corporations, except foreign personal holding companies.

All the income which is classifiable in more than one of such subparagraphs shall be classified under the one which the taxpayer irrevocably elects.   The classification of income of any class not described in subparagraphs (A) to (F), inclusive, shall be subject to regulations prescribed by the Commissioner with the approval of the Secretary.

(3) NET ABNORMAL INCOME.—The term "net abnormal income" means the amount of the abnormal income less, under regulations prescribed by the Commissioner with the approval of the Secretary, (A) 125 per centum of the average amount of the gross income of the same class determined under paragraph (1), and (B) an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income.

(b) AMOUNT ATTRIBUTABLE TO OTHER YEARS.—The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary. * * *

(c) COMPUTATION OF TAX FOR CURRENT TAXABLE YEAR.—The tax under this subchapter for the taxable year, in which the whole of such abnormal income would without regard to this section be includible, shall not exceed the sum of :

(1) The tax under this subchapter for such taxable year computed without the inclusion in gross income of the portion of the net abnormal income which is attributable to any other taxable year, and

(2) The aggregate of the increase in the tax under this subchapter for the taxable year (computed under paragraph (1)) and for each previous taxable year which would have resulted if, for each previous taxable year to which any portion of such net abnormal income is attributable, an amount equal to such portion had been included in the gross income for such previous taxable year.

(d) COMPUTATION OF TAX FOR FUTURE TAXABLE YEAR.—The amount of net abnormal

The respondent disallowed the petitioner's claim for refund of excess profits tax for the year 1940 on the ground that "the royalty income sought to be excluded from excess profits net income as being abnormal in amount is not attributable in whole or in part to any year other than the year 1940."

The petition alleges error by the respondent as follows:

(1) In disallowing the claim for refund, for the reason that the tax was directly attributable to an abnormal income from royalties and the claim should have been allowed under section 721, and particularly subsection (a) (2) (C).

(2) In holding that the royalty income was not attributable in whole or in part to any year other than the year 1940, for the reason that such income was the result of work, research, and development extending over a period of years prior to 1940.

(3) In holding that the royalty income was not abnormal income, for the reason that petitioner's business is not the holding and licensing of patents and receiving royalties therefrom, but is that of manufacturing hosiery.

The petitioner had royalty income in the four years previous to 1940 which averaged $19,924.64, and the specific relief prayed in the petition is the exclusion from excess profits net income of 1940 of $8,511.44 of the $33,417.24 of royalties received in that year. The $8,511.44 is the amount by which the 1940 royalties of $33,417.24 exceed 125 percent ($24,905.80) of the four year average of $19,924.64. As we understand the petitioner's position, it is (1) that the royalty income is income resulting from the development of patents; (2) that it is abnormal income within the meaning of the statute; (3) that $8,511.44 of such income is the amount of the net abnormal income; and (4) that all of such net abnormal income is attributable to previous years and therefore should be excluded in computing the tax.

The royalty income consisted of payments received under the license agreement with Interwoven. Those receipts are different in character and have no qualities or attributes in common with any other type of income derived from the petitioner's operations as a manufacturer of hosiery. Abnormal income is not confined to the six classes of income described in subdivision (a) (2) (A) to (F) of section 721. It includes income "of *any class* includible in the gross income of the taxpayer for any taxable year" (italics supplied), section 721 (a) (1), *supra*, and, whether or not the royalties resulted from the development of patents, as the petitioner contends, they clearly are "income of any class," and, having been received in 1940, they are includible in the

income attributable to any future taxable year shall, for the purposes of this subchapter, be included in the gross income for such taxable year. * * *

(e) APPLICATION OF SECTION.—This section shall be applied only for the purpose of computing the tax under this subchapter as provided in subsections (c) and (d), and shall have no effect upon the computation of base period net income. * * *

petitioner's gross income of the taxable year. Abnormality, under section 721 (a) (1), may exist either (1) where it is abnormal for the taxpayer to derive income of a class, or (2) where it is normal for the taxpayer to derive income of such class but the amount of such income exceeds 125 percent of the average amount of the gross income of the same class for the four previous taxable years. The regulations of the Commissioner provide that "It is abnormal for a taxpayer to derive income of any class only if the taxpayer had no gross income of that class for the four previous taxable years." Regulations 109, sec. 30.721–1.[3] See *Premier Products Co.*, 2 T. C. 445, 453. As the petitioner in each of the four years previous to 1940 derived royalties from the Interwoven license, it was not abnormal for it to derive income of that class in 1940. The receipt of such royalties was in accordance with its normal, regular and established custom, and not a deviation therefrom. The petitioner therefore "normally derive[d] income of such class" in the taxable year (sec. 721 (a) (1), *supra*), and, as the amount of the royalty income received in the taxable year exceeded 125 percent of the average amount of the royalty income of the four previous taxable years, it satisfies the condition of the statute under which normally derived income may be treated as abnormal income. We hold that the petitioner's royalty income of $33,417.24 for 1940 is abnormal income within the meaning of section 721 (a) (1), *supra.*

The next step in the application of the statute is to determine the net abnormal income. Section 721 (a) (3), *supra*, provides that it shall be determined by subtracting from the amount of the abnormal income (1) "125 per centum of the average amount of the gross income of the same class determined" under section 721 (a) (1) (that is, 125 percent of the average amount of the gross income of the same class for the four previous taxable years, see Regulations 109, sec. 30.721–1) ; and (2) "an amount which bears the same ratio to the amount of any direct costs or expenses, deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived as the excess of the amount of such abnormal income over 125 per centum of such average amount bears to the amount of such abnormal income." Under these provisions of section 721 (a) (3) the net abnormal income must be determined by deducting from the abnormal income of $33,417.24 of 1940 the sum of $24,905.80 (125 percent of the average royalties received during the years 1936 to 1939, inclusive), and by further reducing the balance of $8,511.44 thus obtained by a proportionate part $\dfrac{(8,511.44)}{(33,417.24)}$ of any direct costs or expenses through the expendi-

---

[3] Regulations 109 was approved on February 8, 1941 (C. B. 1941–1, p. 117), and was amended on May 3, 1941, after passage of the Excess Profits Tax Amendments of 1941, by T. D. 5045 (C. B. 1941–1, p. 69) to conform to the amended statute. References hereinafter made are to the regulations as amended.

ture of which the $33,417.24 was in whole or in part derived. Regulations 109, sec. 30.721–1. It is with respect to the adjustment on account of a proportion of such direct costs or expenses that, the respondent contends, the petitioner's case breaks down. He argues that the petitioner has not proven the amount of any direct costs or expenses incurred in producing the royalty income or that none were in fact incurred; and he suggests that such costs or expenses might even have exceeded the amount of the abnormal income.

The direct costs or expenses referred to in section 721 (a) (3) are those which are "deductible in determining the normal-tax net income of the taxable year, through the expenditure of which such abnormal income was in whole or in part derived." Were any such costs and expenses paid or incurred by petitioner? The respondent does not indicate, nor are we able to perceive, how the petitioner could have incurred any costs or expenses of the kind mentioned in the statute. We find nothing in the license agreement to establish that the petitioner in 1940 was required to make any direct expenditures in order to be entitled to the royalties of $33,417.24. The royalties were payable at the rate of four cents for each dozen pairs of hose manufactured and sold by the licensee, and the petitioner was not required to bear the expense of such manufacture and sale.

It is true that, in the license agreement, the petitioner undertook, *inter alia*, to prosecute the four Davis applications to final patent, to prosecute such other applications as might be necessary for improvements on men's seamless hose, to pay the expense of obtaining such patents, to prosecute interference proceedings in the Patent Office, and to reimburse the Interwoven Co. for any expenses incident to taking out patents in foreign countries. However, there is nothing in the record to show whether or not the petitioner in 1940 was developing improvements on the Davis inventions or applying for additional patents or foreign patents, but even if petitioner was so engaged, the development costs and legal expenses incurred in such activities would not be deductible in computing normal tax net income. *Gilliam Manufacturing Co.*, 1 B. T. A. 967; *Beaumont Co.*, 3 B. T. A. 822; *John F. Canning*, 29 B. T. A. 99; *Claude Neon Lights, Inc.*, 35 B. T. A. 424, 442. The four Davis applications covering the automatic top were involved in interference proceedings in the Patent Office until the patents were finally granted to the petitioner in 1942, and the evidence shows that, in connection with those proceedings, the petitioner paid attorney fees of $7,408.42 in 1940. But attorney fees paid for conducting an interference proceeding are part of the cost of the patent and are not deductible as an ordinary and necessary business expense. *Hazeltine Corporation* v. *Commissioner*, 89 Fed. (2d) 513; see Regulations 103, sec. 19.23 (1)–7. It is also true that, under its contract with Davis, the petitioner incurred certain obligations, but, assuming

that any amounts paid or incurred in the discharge of such obligations can be characterized as direct costs of deriving the royalties received in 1940, such amounts were not deductible in determining normal tax net income. If any obligation existed in 1940 to pay Davis or the trustee one cent a dozen out of the royalties of that year, the amount thereof was not deductible as an ordinary and necessary business expense of that year. We have so held with regard to the first issue herein. We are satisfied that there were no "direct costs or expenses, deductible in determining the normal-tax net income" of the year 1940, through the expenditure of which the abnormal income of 1940 was derived. Consequently, we hold that the "net abnormal income" under section 721 (a) (3), *supra*, is $8,511.44.

In order that the net abnormal income may be excluded from the petitioner's excess profits net income of 1940, it is necessary that it be found attributable to years other than that taxable year. (Sec. 721 (b); H. Rept. No. 146, 77th Cong., 1st sess., p. 10.) Section 721 (b) provides that "The amount of the net abnormal income that is attributable to any previous or future taxable year or years shall be determined under regulations prescribed by the Commissioner with the approval of the Secretary." The regulations for the determination of the amount attributable to other years appear in section 30.721–3, Regulations 109, and are supplemented by provisions expressly applicable to each of the six classes of income described in section 721 (a) (2), including class (C) income; that is, "Income resulting from exploration, discovery, prospecting, research, or development of tangible property, patents," etc. Sec. 30.721–8, Regulations 109. The material provisions of sections 30.721–3 and 30.721–8 are set forth in the margin.[4]

---

[4] SEC. 30.721–3. *Amount attributable to other years.*—The mere fact that an item includible in gross income is of a class abnormal either in kind or in amount does not result in the exclusion of any part of such item from excess profits net income. It is necessary that the item be found attributable under these regulations in whole or in part to other taxable years. Only that portion of the item which is found to be attributable to other years may be excluded from the gross income of the taxpayer for the year for which the excess profits tax is being computed.

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess of 125 per cent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income.

\*   \*   \*   \*   \*   \*   \*

Specific methods of treating items of net abnormal income of the six classes specified in

The petitioner's contention, as we have already stated, is that the royalty income is "income resulting from the  *  *  *  development of  *  *  *  patents"—income of the class specifically described in section 721 (a) (2) (C), and that, since the petitioner performed and paid for the development over a number of years previous to 1940, all of the net abnormal income of $8,511.44 must be attributed to years other than 1940. Do the facts sustain this contention?

Davis conceived the inventions in 1934 and carried on the experimental work in that year and in 1935. The applications for patents were filed at various times from December 31, 1934, to September 24, 1935. The petitioner bore whatever costs were involved in the experimental work, but the amount of the costs so borne is not determinable on this record. The petitioner also paid the Patent Office fees in 1935 for filing the four patent applications, amounting to $334.60. The patent rights were assigned to the petitioner and by it licensed to Interwoven in 1935, and the petitioner and that company, in 1935, began to practice the inventions in the manufacture of hose. The word "develop" means "To unfold more completely; to evolve the possibilities or power of;  *  *  *  to perfect; advance; further;  *  *  *  to promote the growth of," Webster's New Int. Dic.; "To uncover or unfold; to bring to light by degree, work out in detail." *Blewett* v. *Hoyt*, 103 N. Y. S. 451, 457; 118 App. Div. 227. The foregoing facts indicate that discovery, or invention, was perfected and completely worked out, or developed, when in 1935 the applications were filed and the inventions were put to use, and that the develop-

section 721 (a) are set forth in sections 30.721–6 to 30.721–11. These methods are to be applied subject to the provisions of this section.

*  *  *  *  *  *  *

SEC. 30.721–8. *Exploration, discovery, prospecting, research, or development.*—The third class of potentially abnormal income specifically set forth in section 721 (a) (2) is income resulting from exploration, discovery, prospecting, research, or development of tangible property (such as mines, oil producing property, and timber tracts), patents, formulae, or processes, or any combination thereof, extending over a period of more than 12 months. The exploration, discovery, prospecting, research, or development must be that of the taxpayer. Income resulting from activities of such a character carried on by a predecessor is not entitled to the treatment provided in section 721.

*  *  *  *  *  *  *

In general, an item of net abnormal income of the class described in this section is to be attributed to the taxable years during which expenditures were made for the particular exploration, discovery, prospecting, research, or development which resulted in such item being realized and in the proportion which the amount of such expenditures made during each such year bears to the total of such expenditures. Allocation of items of net abnormal income of the class described in this section must be made according to the principles set forth in section 30.721–3.

*  *  *  *  *  *  *

*Example (2).* In 1939, the A Corporation purchased from X, an inventor, the rights to a device he was developing, paying him $4,500 for such rights. In perfecting the device, the corporation spent $3,000 in 1939 and $6,000 in 1940, or a total of $9,000. A patent was obtained on the device in 1940, and it was licensed for use in the industry. The corporation had a $15,000 item of net abnormal income in 1940 as a result of the royalties received for the use of this device. Of this item $5,000 (3000/9000 of $15,000) is attributable to 1939, and may be excluded from gross income for the year 1940 in the computation of excess profits tax for that year.  *  *  *

ment of the invention was that of Davis and not of the petitioner. Although Davis used the petitioner's time, facilities and materials, the inventions were the original conception or idea of Davis alone, and the petitioner as compensation for its contribution, acquired only a nonexclusive right to practice them. *United States* v. *Dubilier Condenser Corporation, supra,* p. 189. However, section 721 (a) (2) (C) is not limited to the development of "inventions." It refers to the development of "patents." "A patent operates to create and grant to the patentee an exclusive right to make, use and vend the particular device described and claimed in the patent." *Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488, 491. The word "patent" generally covers two concepts—the invention, and the certificate of ownership of the franchise granted by law to the inventor. *Liquid Carbonic Corporation* v. *Goodyear Tire & Rubber Co.,* 38 Fed. Supp. 520, 526. In our opinion, development of patents, within the meaning of section 721 (a) (2) (C), includes not only activities involved in the perfection and working out of the particular device or invention, but also those steps which are essential to obtaining letters patent from the United States. The defense of a patent application in an interference proceeding in the Patent Office is one of such essential steps. The petitioner, as owner of the exclusive right to the invention by virtue of the assignment of 1935, successfully defended the patent applications in the interference proceedings. This activity, in our opinion, was a constituent part in development of the "patents" and, as such, within the meaning of section 721 (a) (2) (C) ; and it satisfies the requirement of section 30.721–8 of the regulations that the development "must be that of the taxpayer."

Section 30.721–8 of Regulations 109 provides that an item of net abnormal income of the class described in section 721 (a) (2) (C) is to be attributed to the taxable years during which the expenditures were made for the particular development which resulted in such item of income being realized and in the proportion which the amount of such expenditures made during each such year bears to the total of such expenditures. The net abnormal income here in question was derived from the license which the petitioner, as owner of the patent rights, had granted to the Interwoven Co., and resulted from the development of the patents. In accordance with section 30.721–8, the net abnormal income should be attributed to the years 1936 to 1942 (the years during which the costs of the interference proceedings were paid) in proportion to the amount spent in each of such years. The total amount of such costs was $51,322.51, of which $7,408.42 was paid in the taxable year 1940. Therefore, $\dfrac{7,408.42}{51,322.51}$ of the net abnormal income of $8,511.44 should be attributed to the

year 1940, and the remainder of the net abnormal income should be attributed to each of the other six years in proportion to the amount expended in each of such years. This is the method applied in example (2) found in section 30.721-8. The present case differs from the hypothetical case given in that example in that here the development work of the taxpayer consisted of the conduct of interference proceedings subsequent to perfection of the device, while in the example it consisted of the completion of the partially developed invention or device purchased from the inventor. However, this difference does not render the method applied in example (2) inapplicable to the facts of the present case, for, as we have hereinabove shown, the development of patents, within the meaning of section 721 (a) (2) (C), includes the conduct of interference proceedings in connection with the obtaining of a patent, as well as the activities involved in the perfection or working out of the particular device or invention which is the subject of the patent.

The respondent contends that several of the provisions set forth in section 30.721-3 preclude the attributing of any portion of the net abnormal income to previous years. Section 30.721-3 contains regulations under which the amount of the net abnormal income that is attributable to other years shall be determined, and section 30.721-8 provides that the allocation of items of net abnormal income of the class described therein (income resulting from the development of patents) must be made according to the principles set forth in section 30.721-3. One provision found in section 30.721-3 and relied upon by respondent as precluding the attribution of any portion of the net abnormal income to previous years is the following:

No portion of an item of net abnormal income is to be attributed to any previous year solely by reason of an investment by the taxpayer in assets, tangible or intangible, employed in or contributing to the production of such income.

The respondent argues that, since the amount spent by the petitioner in the interference proceedings was part of the cost of the patents, such expenditure was an investment by the petitioner in assets employed in or contributing to the production of the net abnormal income, within the meaning of the foregoing provision of section 30.721-3. An "investment," as ordinarily understood, is the laying out or "The investing of money or capital in some species of property for income or profit." Webster's New International Dictionary. It is true that the expense of obtaining letters patent or of contesting interference proceedings is part of the cost of the patent, *John F. Canning, supra; Hazeltine Corporation* v. *Commissioner, supra.* Thus, it would seem to follow that the petitioner, in paying the expense of the interference proceedings, made an investment in patents employed in the production of the net abnormal income, and the attribution of any portion of

that income to previous years would be precluded, as contended by respondent, if the quoted provision of the regulations controls. However, we think that provision is inapplicable here and consequently does not control, since, if the provision be considered in the light of those provisions of the statute and of section 30.721–8 of the regulations which deal with the specific class of income resulting from the development of patents, it is at once apparent that the quoted provision of section 30.721–3 is in conflict with the provisions of the statute and section 30.721–8. Section 721 (a) (2) (C) designates "income resulting from * * * development of * * * patents * * * *extending over a period of more than 12 months* [italics supplied]" as a class of income entitled to the treatment provided by section 721; and the respondent's regulation respecting that class of income (section 30.721–8) provides that an item of net abnormal income of that class is to be attributed to the taxable years during which expeditures were made for the particular development and in proportion to the amount of such expenditures made during each such year. If the word "investment," as used in the above quoted provision of section 30.721–3 of the regulations, includes an investment made by a taxpayer over a period of years in developing an invention and obtaining a patent, that section operates to deny relief to every taxpayer who has made an investment of that character and who derives income from the patents which is abnormal income under the tests provided by section 721—all in contravention of the plain terms and purpose of the statute and the specific provisions of section 30.721–8 of the regulations. We can not attribute to the framers of the regulations an intention to deprive taxpayers of relief plainly authorized by the statute. What character or kind of investment is meant by the words "an investment by the taxpayer in assets" in the above quoted provision of section 30.721–3 is a matter upon which we need express no opinion. It is sufficient for present purposes to say that we think those words do not include, and could not have been intended to include, expenditures made by a taxpayer over a period of more than twelve months in the development of a patent.

Another provision of section 30.721–3 relied upon by the respondent in further support of his contention that no part of the net abnormal income is to be attributed to years other than 1940, is as follows:

Items of net abnormal income are to be attributed to other years in the light of the events in which such items had their origin, and only in such amounts as are reasonable in the light of such events. To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for or decreased competition in the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class of income which is in excess

of 125 per cent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product.

The argument of the respondent is that, since under the license agreement Interwoven was obligated to pay royalty of four cents for each dozen pairs of hose manufactured and sold by it and its liability attached on the date that it began to ship hose to customers, it is obvious that the increase in petitioner's royalty income for 1940 over that of the four previous years was due solely to the fact that Interwoven manufactured and sold more hose in 1940 than in the previous years, and hence it is fair to say that the increase in petitioner's royalty income in 1940 was due solely to improved business conditions, within the meaning of the above quoted portion of section 30.721–3 of the regulations.

Section 30.721–8 provides that, if a taxpayer is engaged in manufacturing or marketing, income from such activities must be segregated as between normal manufacturing income and that attributable to the development work, and that only that part of the profit which is attributable to the development work is within the class of income described in section 721 (a) (2) (C).[5] In other words, where the taxpayer manufactures the patented device and at the same time grants licenses to others, the portion of the income which may be included in class (C) income is an amount measured by the royalty rate paid. In the present case the only income that is involved is the income from the royalties paid by the licensee. When this provision of section 30.721–8 is read in connection with the language contained in section 30.721–3, it becomes quite clear that the limitation imposed by the latter section was intended to apply only to that part of the profit derived from the manufacturing and selling activities of the taxpayer, and that it has no application whatever to income derived exclusively from royalties. Thus section 30.721–3 states:

* * * To the extent that any items of net abnormal income in the taxable year are the result of high prices, low operating costs, or increased physical volume of sales due to increased demand for * * * the type of product sold by the taxpayer, such items shall not be attributed to other taxable years. Thus, no portion of an item is to be attributed to other years if such item is of a class

[5] * * * If the taxpayer engages in manufacturing, marketing, mining, oil production, or similar activities, only such portion of the resulting income as is attributable to exploration, discovery, prospecting, research, or development is within the class of income described in this section. For example, the A Corporation develops a patented device and itself manufactures and sells such device. It also permits other corporations to manufacture such device upon payment of a royalty of $10 for each device produced. Income resulting from the development of the device is the sum of the royalties included in income and so much of the income arising out of the sale of the units manufactured by the taxpayer itself as does not exceed $10 for each device so manufactured and sold.

of income which is in excess of 125 per cent of the average income of the same class for the four previous taxable years solely because of an improvement in business conditions. In attributing items of net abnormal income to other years, particular attention must be paid to changes in those years in the factors which determined the amount of such income, such as changes in prices, amount of production, and demand for the product. * * *

In a case like the present one, even if the prices are high and the cost of production is low, such factors can not in any manner affect the amount of the royalty income payable to the licensor; nor can the amount of such income be affected by any increase in the physical volume of the sales due to an increase in the demand for the type of product "sold by the taxpayer." It can not be denied, of course, that the increase in the volume of sales of the licensee resulted in an increase in the amount of the petitioner's income, but this is, in our opinion, not an improvement in business conditions within the meaning of the regulation. We do not understand the regulation to mean that there be an improvement in business conditions generally or in the business conditions of some one other than the taxpayer. When the sentence reading, "Thus, no portion of an item is to be attributed to other years * * * solely because of an improvement in business conditions" is read in connection with the sentence immediately preceding it, it is quite obvious that the framers of the regulation had in mind an increase not in the income of the taxpayer, but *an increase in the business of the taxpayer* which brings about an increase in the amount of the income. This intention is made plain when the report of the Committee on Ways and Means of the House of Representatives in reporting the 1941 amendments is read. The Committee stated (H. R. No. 146, 77th Cong., 1st sess. p. 10) that:

* * * It is necessary that the item [an item that is includible in the gross income of the taxpayer either because it is abnormal, or because it is in excess of 125 percent of the average amount of the gross income of the same class for the preceding years] be found attributable to other taxable years. Consequently, if an increase *in business* renders an item of income in excess of 125 percent of the income for the test period, the increase in business will not result in such increased income being excluded from excess-profits net income. [Brackets and italics supplied.]

In the case of a taxpayer deriving income from a license granting to others the privilege of manufacturing a device developed by the taxpayer over a period of more than a year and protected by a patent, section 30.721–8 expressly authorizes the treatment of such royalty income as a separate class of income subject to the provisions of section 721 of the code, and it directs that an item of net abnormal income of that class be attributed to the taxable years during which expenditures were made for the particular development which resulted in the

item being realized and in the proportion which the amount of the expenditures made during each year bears to the total of such expenditures. We find nothing in any of the language of section 30.721-3 which precludes the attributing of the net abnormal income of the petitioner to previous or future years in the manner directed by section 30.721-8.

We hold that the petitioner is entitled to exclude from its excess profits net income of 1940 the portion of its net abnormal income of 1940 which is attributable to the years 1936 to 1939 and 1941 and 1942. The portion attributable to 1940, as we have indicated above, is $\frac{7,408.42}{51,322.51}$ of the net abnormal income of $8,511.44, and we hold further that the petitioner is not entitled to exclude that portion from its excess profits net income of 1940. In making the foregoing apportionment we adopt the sum of $51,322.51 as the total development costs, rather than the sum of $51,657.11, for the reason that the $334.60 expended in 1935 for filing the patent applications was expended while the inventions and patent rights belonged to Davis.

3. *Obsolescence or loss.*—The depreciated cost of the Fidelity machines as of the close of 1939 was $9,289.55, and their salvage value was $1,240. The petitioner seeks to deduct the depreciated cost, less salvage value, or the sum of $8,049.55, in the year 1940, either as a reasonable allowance for obsolescence (sec. 23 (1), I. R. C.), or as a loss sustained during that year by reason of abandonment (sec. 23 (f)).

In our opinion, the deduction is not allowable under either of the statutory provisions above cited. Obsolescence is a process, more or less gradual, whereby property, as a result of external causes in contradistinction to deterioration in its physical condition, becomes obsolete by losing its economic usefulness for the purpose for which it was acquired, and by being useless for any other purpose; such external causes as, for instance, changes in style or progress in the art in which the property is employed. *Manhattan Brewing Co.*, 6 B. T. A. 952; *Des Moines Title Co.*, 39 B. T. A. 729, and cases cited therein. The allowance for obsolescence is for capital losses which take place over a period embracing more than a single taxable year, and the loss must be spread over the period from the time the process of becoming obsolete begins to the time when the process is completed. *William Zakon,* 7 B. T. A. 687; *Tennessee Fiber Co.*, 15 B. T. A. 133; *Olean Times Herald Co.*, 37 B. T. A. 922. Cf. *Des Moines Title Co., supra.* "The manifest intendment of Section 234 (a) (7) [of the Revenue Acts of 1924 and 1926], and the regulations promulgated pursuant thereto, was to authorize deductions similar to ordinary depreciation to cover gradual exhaustion, * * * and obsolescence over a period of years, as distinguished from deductions for losses which were authorized

by Section 234 (a) (4) [of the same acts]." *Becker* v. *Anheuser-Busch, Inc.*, 120 Fed. (2d) 403; certiorari denied, 314 U. S. 625.

Section 234 (a) (7), referred to in the above quotation, so far as is material here, is identical with section 23 (l) of the Internal Revenue Code, and section 234 (a) (4) referred to, so far as is material here, is identical with section 23 (f).

There is nothing in this record which would indicate that there was any obsolescence of the Fidelity machines prior to the taxable year involved, but, on the contrary, the facts respecting the petitioner's production of Fidelity-made anklets indicate quite definitely that the process of becoming obsolete had not begun in 1938 or 1939, but that it began in 1940, and obsolescence, if any, became complete in that year. Thus, in 1938 over 50 percent of petitioner's total output consisted of Fidelity-made anklets; and in 1939, when the total output was more than twice that of 1938, about 20 percent of the total output was Fidelity-made anklets. The sharp decline in the production of Fidelity-made anklets took place in 1940, when but 2 percent of the total production was of that type, and it was only after 1940 that the petitioner discontinued production of those anklets. The extent to which the petitioner used the machines in 1938 and 1939 is inconsistent with the existence of a state of obsolescence in those years, and there is no testimony in the record tending to establish that the petitioner, or its officers, in 1938 or 1939, anticipated the disappearance of the demand or that it would be necessary to discontinue use of the machines prior to the end of their normal useful life. Since the petitioner has failed to establish the requisite period of obsolescence, no deduction for obsolescence for 1940 can be allowed, either in the amount of the entire depreciated cost, less salvage value, or in any lesser amount.

If any deduction is to be allowed for the depreciated cost, less salvage value, in the year 1940, the authority therefor must be sought in section 23 (f) of the Internal Revenue Code, which permits a corporation to deduct "losses sustained during the taxable year * * *." The Commissioner's regulations provide that the difference between the adjusted basis and the salvage value of a capital asset may be deducted as a loss under section 23 (f) where the usefulness of the asset in the taxpayer's business is suddenly terminated and the taxpayer discards it permanently from use in such business. Regulations 101, art. 23 (e)–3; art. 23 (f)–1; *Williams Furniture Corporation*, 45 B. T. A. 928. The respondent opposes consideration of the petitioner's claim under section 23 (f)–1 on the ground that the issue of a loss is not presented by the pleadings. The petition does not mention section 23 (f) and it repeatedly refers to the petitioner's claim as one

on account of obsolescence. However, it does allege error by the respondent in holding, with respect to a deduction claimed on account of abandonment of the machines, "that there was no proof of abandonment as distinguished from nonuse," and it further alleges as a fact that the machines were "entirely abandoned in 1940." We think these allegations are sufficient to present a claim for the deduction under section 23 (f).

Since it is clear from what has been said above that the usefulness of the machines in the petitioner's business was, for the time being at least, suddenly terminated in 1940, the only question is whether the machines were actually and permanently abandoned in that year.

In order to establish abandonment, there must be an intention of the owner to abandon the property, coupled with an act of abandonment, and such intention and action must be ascertained from all the facts and surrounding circumstances. *Belridge Oil Co.*, 11 B. T. A. 127; *Reuben H. Donnelley Corporation*, 26 B. T. A. 107, and authorities cited therein; *Fox River Paper Co.*, 28 B. T. A. 1184; *Minneapolis, St. Paul & Sault Ste. Marie Ry. Co.*, 34 B. T. A. 177; and *Ewald Iron Co.*, 37 B. T. A. 798.

The evidence shows nonuse of the machines after they were removed from the mill and stored in the basement, in 1940; but nonuse, alone, is not enough. *I. G. Zumwalt*, 25 B. T. A. 566; *Williamson Veneer Co.*, 10 B. T. A. 1259; *Ewald Iron Co.*, *supra.* Discontinuance of use was due to the lack of a market demand for the anklets made by the machine, but had such a market thereafter come into existence the machines could have been again used; and, although the petitioner could not determine with any degree of certainty whether there would ever again be a market for the anklets, its action indicates an intention to preserve the machines for possible future use rather than an intention to abandon them. The machines had a salvage value of $20 each, and were not worthless. The petitioner did not advertise them for sale or otherwise attempt to dispose of them. It continued to carry them as an asset on its books, and it did not charge off any reserve for loss of value. Its auditors reflected the machines as an asset in all audit reports. The machines suffered no loss from deterioration while in storage. They were on hand and ready for use and in the event of a recurrence of the market demand for the fancy-top anklets produced by the machines the petitioner could place the machines in operation. The evidence does not establish a permanent abandonment of the machines in 1940, and the deduction claimed by the petitioner on this ground is denied. See *Williamson Veneer Co.*, *supra; McAvoy Co.*, 10 B. T. A. 1017; *Tennessee Consolidated Coal*

*Co.*, 24 B. T. A. 369; *Ewald Iron Co.*, *supra*, and cases cited therein; *U. S. Industrial Alcohol Co.*, 42 B. T. A. 1323, 1382, 1383.

Reviewed as to section 721 (a) (2) (C) by the Special Division.

Reviewed by the Court as to the other issues.

*Decision will be entered under Rule 50.*

MURDOCK, *J.*, dissenting: The Fidelity machines became completely obsolete during the taxable year. The petitioner discontinued its use of them and set them aside with no prospect of ever finding further use for them. It is entitled to deduct the difference between their remaining basis and their salvage value.

SMITH, ARUNDELL, and HARRON, *JJ.*, agree with this dissent.