KELLER STREET DEVELOPMENT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 71919.   Filed December 26, 1961.

*James J. Arditto, Esq.*, for the petitioner.
*Thomas F. Greaves, Esq.*, for the respondent.

FAY, *Judge:* The Commissioner determined deficiencies in the petitioner's income taxes, as follows:

| Taxable year ended | Amount |
|---|---|
| Oct. 31, 1952 | $183, 897. 17 |
| Oct. 31, 1953 | 194, 552. 69 |
| Dec. 31, 1953 | 15, 069. 53 |
| Dec. 31, 1954 | 27, 593. 87 |

Some of the issues have been conceded by the parties. The issues remaining for decision are as follows:

(1) Is the petitioner entitled to an obsolescence deduction on its brewhouse building and equipment in each of the taxable years under consideration and an obsolescence deduction in the taxable year ended December 31, 1954, on certain bottling machinery purchased but never used?

(2) Were certain expenses incurred by the petitioner in some of the taxable years so intimately connected with a betterment program of its plant that they must be treated as capital expenditures?

(3) Is the petitioner entitled to additional depreciation on certain machinery and equipment for the taxable years in question?

(4) Is the petitioner entitled to additional depreciation on a steel warehouse for the year ended December 31, 1954?

FINDINGS OF FACT.

A few of the facts have been stipulated and are found as stipulated.

The petitioner was, during the taxable years with which we are concerned, in the business of brewing and selling beer.

The Maier Brewing Company was founded in Los Angeles, California, as a proprietorship in 1875. It was incorporated in California in 1907 to form the petitioner, and operated as a successful brewery until the advent of prohibition, when it ceased operations. It returned to the brewing business after the repeal of prohibition but encountered financial difficulties. Sometime in the mid-1930's it became bankrupt. It emerged from bankruptcy in about 1943 under new management and continued in the brewing business under the name Maier Brewing Company until October 15, 1958, on which date it officially changed its name to the Keller Street Development Company.

The petitioner filed its income tax returns for the taxable years in question with the director of internal revenue, Los Angeles, California.

I. *Obsolescence on Brewhouse Building, Machinery, and Equipment and the Machinery Bought for a New Bottlehouse.*

The petitioner operated a brewery in the city of Los Angeles, California. The brewing plant comprised two buildings or unified complexes of buildings. One of these was the brewhouse, the other was

the bottlehouse. Both of these buildings were on a single tract of land but were separated by Aliso Street which ran along an easement on the tract which had been taken by the City in the last century. The petitioner retained the fee in the street and carried on its unified operation of brewing and bottling beer by piping it from the brewhouse through a tunnel under the street to the bottlehouse.

Aliso Street was undistinguished among the other city streets in the area. Although it bore a considerable amount of traffic it was not unusually heavily traveled. It was therefore possible to walk across the street from the brewhouse to the bottlehouse. It was also possible to go by vehicle directly from the brewhouse to the bottlehouse. This could be done by driving on Vignes Street, a street which ran across Aliso Street along the east side of the petitioner's plant. It could also be done by crossing Aliso Street from an alley on the petitioner's brewhouse property to Lyon Street, which extended to the north along the east side of the petitioner's bottlehouse property.

The petitioner made use of the easy access from one building to the other. Its trucks would occasionally stop at the bottlehouse to pick up a load of bottled beer and then drive across Aliso Street to the brewhouse property to load kegs of beer which were to be delivered on the same trip. In addition, a number of the petitioner's managerial and maintenance employees worked in both areas and walked from one building to the other across Aliso Street at various times during the working day.

Both the brewhouse and the bottlehouse were essential to the petitioner's business, and it would be unable to continue its business in the absence of either.

In August 1951 it came to the attention of the petitioner's officers that the State was contemplating making Aliso Street part of a freeway and widening it to encroach upon petitioner's property. Upon making inquiries, the petitioner learned that the State had settled upon a plan to run the Santa Ana Freeway along Aliso Street and to widen the roadway in a manner that would require the taking of 18 feet of the petitioner's bottlehouse. In September 1951 conversations began between representatives of the petitioner and those of the State concerning the settlement to be made by the State.

Negotiators for the petitioner explained to the State's representatives that the brewhouse building would be useless without the bottlehouse and that the machinery and equipment in both buildings were so adapted to the systems of which they were a part and the buildings in which they were installed that they would be of negligible value unless installed as a unit in a building especially constructed to accommodate them. These representations were, in fact, true.

In view of these facts, the representatives of the State indicated that they might include as part of the settlement for the property

taken a transfer to the petitioner of a piece of property to the west of the brewhouse property which could be used for a bottlehouse. Representatives of the State indicated the likelihood that the bottlehouse property would be taken in about 8 months.

The petitioner, therefore, had plans drawn up for a bottlehouse that could be built on the State's land west of the brewhouse. In December 1951 the petitioner ordered more than one-half million dollars' worth of bottlehouse machinery and equipment which was to be especially designed and built for the planned building.

In the early part of 1952 the negotiations with the State continued but little progress was made toward reaching a settlement. In addition, a commitment had been made by the State to reserve the land west of the brewhouse for the use of a railroad company should the railroad company desire it, and a substantial portion of the western end of this parcel was to be used for an access ramp for the freeway. Because of these facts, the petitioner's officers then reasonably believed it would be unlikely that they could obtain the land west of the brewhouse in an amicable settlement with the State.

Therefore, the petitioner in April or May 1952 acquired a parcel of land across Vignes Street and immediately east of its brewhouse. Shortly after this land was acquired, the petitioner learned that the State planned to take portions from each end of this parcel for an access ramp on the east end and a tunnel under the freeway on the west end. The remaining part of the land would be too small to be used for a bottlehouse.

Since this land could not be used for a bottlehouse, the petitioner, during the summer of 1952, contracted to purchase land extending to the east from the bottlehouse building as well as a 5-acre tract located about a thousand feet east of the bottlehouse.

With the discovery that the State also intended to use the land immediately to the east of the bottlehouse for an access ramp to the freeway, the petitioner's last hope of acquiring land for a bottlehouse in reasonable proximity to its brewhouse evaporated.

The petitioner's officers, therefore, concluded that their only reasonable course of action would be to construct the bottlehouse on the 5-acre tract which was some distance from their present facilities. Although the petitioner could have operated its bottling facilities at some distance from its brewhouse for a short period, it would not have been economically feasible for it to do so for a long period of time. The petitioner's officers, therefore, decided to build a new brewhouse on the 5-acre tract, adjacent to the planned bottlehouse, and determined that this would be done by 1956.

The petitioner's officers were also influenced in their determination to build on the 5-acre tract by the fact that the State's freeway

plans included an overpass above the freeway at Vignes Street. This overpass, as planned, would have been too low to allow the passage of railroad cars under it and thus would have made the rail spur used to bring raw materials to the brewhouse useless. The petitioner would have been seriously hampered in meeting its competition without a railroad spur.

The State filed a complaint in condemnation on December 1, 1952. This complaint covered the taking of a portion of the petitioner's bottlehouse property and building. On April 9, 1954, the State filed an amended complaint which, although it included in the property to be condemned certain other land of the petitioner, did not include any taking of the bottlehouse or brewhouse property except the access rights along the freeway. The petitioner's officers had known that the State had changed its plans somewhat before the amended complaint was filed. However, the State had altered various aspects of its plans so frequently that the petitioner's officers could not conclude that this new plan of which they were told would have any finality, until the amended complaint was filed.

The petitioner's officers continued to negotiate with the State until 1956 with a view to reaching a settlement for the property taken. No settlement was ever reached, but payment was made for the land in accordance with a judgment rendered in the condemnation action in 1956. The final judgment resulted in payment of $205,000 for the taking of surface access rights to the brewhouse and bottlehouse properties and portions of other parcels of land owned by the petitioner in the vicinity of the brewery.

After the acquisition of the 5-acre tract, certain work was done preparatory to building a brewery there. The tract, when purchased, bore many structures. One of these was a synthetic rubber plant which was supported by a large amount of concrete under the surface of the soil. The petitioner cleared the land of surface structures, excavated extensively to remove subsurface structures, refilled and graded it. Further, plans were drawn for the extension of the beer tunnel so that it would run from the brewhouse to the 5-acre tract. An easement had been obtained across the intervening land for this purpose. No further steps were taken toward construction of a new brewery because of the advice of the petitioner's attorney, who felt that such action might prejudice the petitioner in its negotiations with the State over the land to be taken for the freeway project.

In 1952 the officers of the petitioner determined that a new brewhouse would be in operation by July 1956 and that the present brewhouse, together with its machinery and equipment, would have no useful life beyond that date. The petitioner, therefore, deducted an amount for obsolescence computed on this basis in its income tax re-

turns for fiscal years 1952 and 1953, for a short taxable year ended December 31, 1953, and for the calendar year 1954.

Several producers of nationally advertised beer established breweries in the Los Angeles area during 1954, with the result that they were able to sell their beer at local prices. This competition reduced the petitioner's gross sales greatly in 1954 and resulted in the loss of most of its distributors to other brewers. Therefore, in October 1954 the petitioner's officers determined that they would have to abandon plans for the construction of a new brewery. The brewhouse in question was still in use at the time this case came to trial.

In 1956 the petitioner filed an amended income tax return for 1954 in which it reduced its obsolescence claimed on the brewhouse and on its machinery and equipment to eliminate the portion attributable to the part of the year 1954 after plans to build a new brewery had been abandoned.

The machinery which the petitioner purchased for a new bottlehouse had not been used, with the exception of a can line and a few other pieces. It had been stored under tarpaulins on the property of the petitioner. In the amended return filed in 1956 covering the taxable year 1954 the petitioner claimed an obsolescence deduction for the machinery and equipment bought for a new bottlehouse which was rendered useless by the decision that a new brewery could not be built.

## II. *Deductions for Repair Expense.*

The buildings which house the petitioner's brewery were very old, one having been built in the last century and one early in the present century. When the company recommenced operations after the repeal of prohibition, it encountered financial difficulties which terminated in bankruptcy. However, it emerged from bankruptcy during World War II and under the stimulus of new management, as well as increased demand for its product during the war, it began to make sizable profits. About the middle of World War II, then, was the first opportunity that the company had to modernize its plant and facilities, and the petitioner began to do so. Most of the wartime profits were returned to the business for this purpose. After the end of the war, although profits were reduced, the program was continued and completed by 1952.

During the taxable years in question the petitioner made some capital improvements to its plant and equipment. Most of these were designed to increase the petitioner's productive capacity so that it would be able to fill orders generated by a substantial advertising program.

The Commissioner disallowed certain repair expense deductions taken by the petitioner during the fiscal years 1952 and 1953 and

calendar year 1954 on the grounds that they were a part of a general betterment program.

During the taxable years in question the petitioner was not engaged in a general betterment program.

### III. *Additional Depreciation on Steel Warehouse.*

In 1954 the petitioner constructed a steel warehouse on the land it had purchased in 1952 east of its brewhouse. The seller of the land, Southern Counties Gas Company, had reserved an easement for some pipes which ran across the property. The warehouse was constructed above the area where the pipes were laid. The cost of this building was estimated in the building permit to be $46,000.

In its original return for 1954 the petitioner took a depreciation deduction based on a useful life for the warehouse of more than 1 year. In the amended return filed in 1956 covering the taxable year 1954 the petitioner claimed a deduction for depreciation for the building based on a useful life of 1 year.

### IV. *Additional Depreciation on Certain Brewery Machinery and Equipment.*

The petitioner acquired certain machinery and equipment for its brewery in the years 1952, 1953, and 1954. In its original tax returns for the taxable years in question the petitioner claimed a depreciation deduction on this machinery and equipment based on useful lives ranging from 5 to 15 years. In 1956 either an amended return or a claim for refund for each of these years was filed by the petitioner in which it claimed an additional depreciation deduction based on useful lives of only 4 years.

#### OPINION.

### I. *Obsolescence on Brewhouse Building, Machinery, and Equipment and the Machinery Bought for a New Bottlehouse.*

It is the petitioner's contention that it is entitled to an obsolescence deduction [1] on its brewhouse building, machinery, and equipment for the taxable years in question because during those taxable years it was reasonably certain that the State of California would take a portion of the land on which petitioner's brewery was built. This taking would render the brewhouse and its equipment useless except for the period required to construct a new brewhouse. The respondent urges, among other things, that in the circumstances of this case the threat of condemnation cannot give rise to an obsolescence deduction because

---

[1] The obsolescence deduction is provided for in section 23(l) of the Internal Revenue Code of 1939 and section 167(a) of the Internal Revenue Code of 1954.

if the State were to injure one portion of the petitioner's land by taking another it would be required to reimburse the petitioner for the damage done. We agree with this contention.

Article I, section 14, of the Constitution of the State of California provides: "Private property shall not be taken or damaged for public use without just compensation having first been made to, or paid into court for, the owner * * *."

Compensation is given not alone for the land actually taken but also for the damage to the landowner's remaining land. *Yolo Water & Power Co.* v. *Hudson*, 186 Pac. 772 (1920). Damages include the value of improvements to the land. *City of Los Angeles* v. *Klinker*, 25 P. 2d 826 (1933). That case also indicates that machinery may be considered to be fixtures.

Here the petitioner contends that its brewhouse would have been rendered useless if a portion of the bottlehouse were taken. Under these circumstances the petitioner would have been entitled to compensation from the State of California for the loss of value to its brewhouse. The value of much of the brewhouse machinery would have been included in the award because there was testimony that the building was specially adapted to this equipment and it was necessary to remove outer walls of the building in order to get some of the equipment inside. *City of Los Angeles* v. *Klinker*, *supra*.

We do not believe that a threat of condemnation in which compensation would be given for the damage done to a plant and its equipment can give rise to an obsolescence deduction on that plant and equipment. This Court has denied an obsolescence deduction in two cases in which buildings were sold at a time when they still retained substantial value. *Olean Times-Herald Corporation*, 37 B.T.A. 922 (1938); *Southeastern Building Corporation*, 3 T.C. 381 (1944), affd. 148 F. 2d 879 (C.A. 5, 1945), certiorari denied 326 U.S. 740 (1945). A condemnation in which an award is given for property damaged is akin to a sale.

In *Southeastern Building Corporation*, *supra*, it was indicated that the purpose of the obsolescence deduction is to provide for the return of cost or other basis of property during its economically useful life when ordinary depreciation is insufficient for this purpose. Thus, this deduction is not required when the remaining value of the property may be recouped in a condemnation award. Finally, if a taxpayer could, upon threat of condemnation, avail himself of an obsolescence deduction for property which would be damaged, he could obtain a deduction against ordinary income and, upon receiving the award or later upon sale of the remainder of the property, he would have income taxed only at the rate provided for long-term capital gains. Cf. *Massey Motors* v. *United States*, 364 U.S. 92, 97 (1960).

It is recognized that there may be situations in which improvements on property which is threatened by condemnation may not be compensated for because they add nothing to the market value of the land. There may, nevertheless, be a substantial remaining basis for these improvements. In such a case, use of the obsolescence deduction may be appropriate. This does not appear to be true in the present case for surely the presence of a modern brewery added something to the value of the land.

It is the petitioner's contention that it is entitled to an obsolesence deduction in 1954 on certain bottlehouse machinery and equipment purchased but never used because this machinery became useless in 1954 when the petitioner's officers determined that it would not be economically feasible to build a new bottlehouse. Respondent, on the other hand, contends that obsolescence is a gradual process which cannot occur within 1 taxable year.

Obsolescence is the process of becoming obsolete. Although property may become obsolete in 1 year, the obsolescence deduction may be availed of only where property becomes useless over a period greater than 1 year. *W. B. Davis & Son, Inc.*, 5 T.C. 1195, 1217 (1945). The question whether the remaining basis of this machinery may be deducted is not before this Court because the petitioner did not seek a loss deduction for this property either in its tax return for the year involved or in its petition. *Real Estate Title Co.* v. *United States*, 309 U.S. 13 (1940). In any event, the petitioner has not shown that it is entitled to such a deduction because it has not shown that the property was discarded, abandoned, sold, or otherwise retired during the taxable year. *Olean Times-Herald Corporation, supra; W. B. Davis & Son, Inc., supra.*

## II. *Deductions for Repair Expense.*

The respondent has singled out a number of items deducted by the petitioner as expenses which he contends should have been treated as capital items. The respondent does not contend that these expenditures, taken individually, are capital in nature. He alleges, however, that they are a part of a general betterment program and, therefore, should be capitalized even though, viewed individually, they would be deductible as ordinary and necessary expenses under section 23(a)(1)(A) of the Internal Revenue Code of 1939 or section 162(a) of the Internal Revenue Code of 1954.

This Court has in several cases stated that expenditures which under other circumstances would be ordinary and necessary expenses should be treated as capital expenditures when they are part of a general betterment program. *Joseph Merrick Jones*, 24 T.C. 563

(1955), affd. 242 F. 2d 616 (C.A. 5, 1957); *I. M. Cowell*, 18 B.T.A. 997 (1930); *Home News Publishing Co.*, 18 B.T.A. 1008 (1930); *California Casket Co*, 19 T.C. 32 (1952).

We have found as a fact that there was no general betterment program in progress during the subject taxable years. This finding is based on the fact that the brewery was in operating condition and use during the taxable years in question and had been for several years before. It is further based on a showing by the petitioner that the changes made in the brewery during these years involved only certain capital improvements made to increase capacity but not such as would constitute a general betterment program. A few other capital improvements were made but they were of the type that must be constantly made by a manufacturer in a competitive industry and therefore not to be considered part of a betterment program.

The petitioner has conceded that some of the questioned repairs should be treated as capital expenditures. With respect to the remainder of these expenditures, in the absence of any general betterment program we must find in favor of the petitioner.

### III. *Additional Depreciation on Steel Warehouse.*

The petitioner contends that it should be allowed to depreciate its warehouse building built in 1954 based on a useful life of 1 year because it was built on land over which a gas company held an easement which would allow that company to demand the removal of the building at any time. We are, however, unable to consider this question further because the petitioner has not presented any evidence from which we can determine the extent of the gas company's rights under the easement. Although there was testimony that an easement existed, the terms of that easement were not placed in evidence. The Commissioner's determination must therefore be upheld.

### IV. *Additional Depreciation on Certain Brewery Machinery and Equipment.*

The petitioner contends that it should be allowed a depreciation deduction on certain machinery and equipment purchased during the taxable years in question based on useful lives shorter than those used in the original returns made by the petitioner for the taxable years in question. The respondent takes the position that the useful lives used to determine the depreciation deductions in the original return were correct. The petitioner has not submitted sufficient evidence for this Court to determine the proper useful lives for the equipment involved. Therefore, we must find in favor of the respondent on this issue.

*Decision will be entered under Rule 50.*