A. T. JERGINS TRUST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 29940. Promulgated March 5, 1931.

*Thomas R. Dempsey, Esq.,* and *A. Calder Mackay, Esq.,* for the petitioner.

*Mason B. Leming, Esq.,* and *C. A. Ray, Esq.,* for the respondent.

552

558

OPINION.

PHILLIPS: The first and major question presented is whether so much of the income of petitioner as was derived from its oil and gas lease on lands owned by the city of Long Beach was exempt from Federal income and profits taxes. It is pertinent to point out that we do not have before us the issue whether the income of the city from the same lease is subject to such taxation. Petitioner vigorously contends that a tax upon its income from the lease constitutes a burden on the city's right to lease and on the property itself, and is in fact a tax upon the municipality in violation of the rule that neither the Federal Government nor any State may tax an agency of the other. A similar case was carefully considered by the Board in *Coronado Oil & Gas Co.*, 14 B. T. A. 1214, where we held that income derived by a private lessee from oil and gas leases on lands owned by a State was subject to Federal taxation even though the leased lands were held for public school purposes. Petitioner seeks to distinguish the *Coronado* case from this proceeding. It is urged that the lands leased by petitioner were acquired for governmental purposes, viz., to furnish water to the city and that having been so acquired the city was bound to use them so as to produce the greatest benefit to its citizens. Conceding this to be true, this proceeding would still be governed by the *Coronado* case, where the lands leased were held for public school purposes. There is no basis for doubt that education is at least as much of a governmental function as the supply of

water. Furthermore, it should be pointed out that the petitioner was not furnishing water to the city and therefore was not an instrumentality through which the city was performing that function.

The income sought to be taxed is not the income of the city from the lease. It is the income of the lessee. Neither was it derived from the pumping and distribution of water, but from an oil and gas lease on land which was originally acquired for water purposes, but which is now used by the city not only for such purposes, but for many others. Besides granting to petitioner' an oil and gas lease on this property, the city has granted another such lease and there are on the property approximately 60 other tenants who hold under leases and permits, all subject to the city's water rights, who engage in business ranging from farming to oil plants and whose income under petitioner's reasoning would be exempt or at least partially exempt from income tax. The fact that the city officers may have been coerced by political or other pressure into granting these leases and permits is immaterial. All such public officers are subject to such pressure. The fact remains that the city is largely using this property for purely commercial purposes. But whatever may be the nature of the city's functions with respect to these lands, it is clearly apparent that they are no more governmental in character than the maintenance of a public school system as in the *Coronado* case. Petitioner's position in this respect is no stronger than that of the taxpayer in that case.

Next, it is asserted that petitioner was under the control of the city authorities to such an extent as to render it an agency or instrumentality of the city in the development of its lands. If this is true, so also is it true of all the remaining city tenants and licensees. It is not pointed out how such control can change a business into a governmental function, nor is it clearly pointed out how this conclusion is reached. It is true that in *Metcalf & Eddy* v. *Mitchell*, 269 U. S. 514, the Court referred to the question of control in arriving at the conclusion that the firm was not an employee, but rather an independent contractor. Here it is clear that petitioner is not an employee of the city, but is a lessee under an oil and gas lease and is liable just as any other lessee under the terms of its lease. Operating in the midst of a water plant, it was restricted to a greater extent than an ordinary lessee, but all these restrictions are set forth in the lease and are purely contractual. That the city kept strict watch in order that it might receive all to which it was entitled, does not differentiate the city from any other lessor who was equally desirous of such returns, neither was the city's interest in its return any greater than the interest of the State of Oklahoma in securing

the best returns it could from its school lands. On authority of *Coronado Oil & Gas Co.*, *supra*, we find for respondent on this issue. See also *Bass* v. *Group No. 1 Oil Corp.*, 38 Fed. (2d) 483.

Petitioner asserts that it lost in the year 1924 the amount of $68,207.04, which it is stipulated was expended by it in connection with the Davis and Menifee leases. The evidence on this issue, which was partly stipulated, is quite meager. By the contracts of June, 1923, Ramsey and Buttram agreed to assign to petitioner, in consideration of its drilling one test well, a one-half interest in several leases owned by Ramsey and also a one-half interest in a lease owned by Ramsey and Buttram jointly. The assignments were to be placed in escrow and to be delivered when petitioner drilled the test well. Petitioner's president testified that the assignments were never delivered, but it is recited in the contract of July 17, 1924, that petitioner was the owner of an undivided one-half interest in the leases. There is also testimony that two test wells were completed upon these premises. The conclusion seems clear that the petitioner fulfilled its contract and became entitled to receive the assignments of a one-half interest in the several leases. Whether or not the assignments were delivered seems immaterial.

The petitioner having received this one-half interest in these leases as a consideration for drilling the test well, would not be entitled to deduct such cost until it was established that the leases were worthless. The fact that two wells came in dry, coupled with the testimony of the president of the petitioner would, perhaps, have been sufficient to have established the worthlessness of these leases, were it not for the contract which was entered into between Ramsey and the petitioner on July 17, 1924. The conclusion must be drawn from this contract that Ramsey and the petitioner, both of whom were experienced oil men, regarded the leases as still having some value. This contract provided for the assignment of all these leases to Ramsey, who agreed as a consideration therefor to pay a balance of $4,435.95 due upon one of the wells, to drill a well upon another of the leased properties, and to pay to the petitioner 20 per cent of the oil and gas recovered. The property upon which Ramsey was to drill the new well was not the same property upon which wells had been drilled by the petitioner. The petitioner contracted to make the payments necessary to keep all of the leases in existence. These undertakings, particularly the latter, indicate that the parties did not consider the leases to be worthless. It may be that they were regarded as of little value but, if the parties were willing to continue to pay the rents and royalties necessary to keep such leases alive despite two dry holes, they evidence their opinion of some value. In a case such as this it would be more reasonable

to fix the date of worthlessness as being the date when the parties refused to pay further rents and royalties.

We appreciate that this conclusion is opposed to the testimony of the president of the petitioner. That testimony undertook to state the recollection and opinion of the witness several years after the fact and appears to be contradicted by the terms of the agreement entered into on July 17, 1924. The action of the Commissioner in refusing to allow the cost of acquiring the one-half interest in these leaseholds is approved.

The final contention of petitioner is that respondent erred in adding its drilling and development expenses to the amounts recoverable through depletion. Petitioner has waived its contention that these costs are proper subjects for annual deductions and apparently concedes that they should be capitalized. We believe that this is the proper solution of the problem. Cf. *Consolidated Mutual Oil Co.*, 2 B. T. A. 1067, *Old Farmers' Oil Co.*, 12 B. T. A. 203. Both parties agree that these capital expenditures are returnable to petitioner during the life of its lease and they differ only as to the character of the deduction. Respondent has allowed it as depletion, while petitioner claims it as depreciation. Respondent has added these expenditures to amounts recoverable through depletion and has thus determined a larger depletion unit. Ordinarily, where there is no difference as to the rate, it would become immaterial whether the capital cost was recovered as depreciation or as depletion. But section 234 (a) (8) of the Revenue Act of 1924 as restricted by section 204 (c) of the same act places certain limitations on the deduction for depletion while the deduction for depreciation is subject to no such restrictions. In the present case the restriction operates to deny to petitioner the full amount of the deduction for depletion to which it would otherwise be entitled. Under these conditions it becomes necessary to discuss the character of the deduction. Section 234 (a) (9) of the Revenue Act of 1921 and section 234 (a) (8) of the Revenue Act of 1924 permit the deduction in cases such as this of " a reasonable allowance for depletion and for depreciation of improvements   *   *   * ." As we understand the stipulation, the amounts in controversy were expended in drilling wells and in operations preparatory and relating to such drilling, all of which would constitute a part of the cost of the structure recoverable through depreciation. On the other hand, the concept of the term " depletion " is the exhaustion of the mineral content of a mine or an oil well. *United States* v. *Ludey*, 274 U. S. 295. The precise wording of the statute indicates clearly that Congress had in mind the distinction between the exhaustion of the natural resources and the recovery of the capital invested in the improvements necessary to work the property. It can not be seriously contended that the exhaustion of

petitioner's investment in preparing for and in drilling its wells constitutes any part of the exhaustion of its oil reserves.

The Commissioner relies upon article 223 of Regulations 62 which provides:

Such incidental expenses as are paid for wages, fuel, repairs, hauling, etc., in connection with the exploration of the property, drilling of wells, building of pipe lines, and development of the property may at the option of the taxpayer be deducted as a development expense or charged to the capital account returnable through depletion. *If in exercising this option the taxpayer charges these incidental expenses to capital account, in so far as such expense is represented by physical property it may be taken into account in determining a reasonable allowance for depreciation.* * * * (Italics supplied.)

If this regulation is susceptible of the construction which has been placed upon it in this case, it is in conflict with the provisions of the statute, which allows improvements to be depreciated. It seems to us, however, that the regulation has not been properly applied in this case. The construction used in computing the deficiency was that tangible assets which go upon the property, such as lumber, cement, casing, tubing, etc., are all charges that " are represented by physical property while other costs were not." The cost of labor for erecting the derrick or drilling the well, the fuel used in such operation, the cost of hauling such materials are all " represented by physical property." The Commissioner in his brief recognizes that such is the case and now urges that we sustain his action upon the ground that the stipulated facts are insufficient to show what part of the amounts disallowed were represented by·physical property. The stipulation shows that the Commissioner has allowed as the cost of improvements (the word used in the statute) only the amounts expended for physical equipment and has refused to treat as cost of improvements amounts expended for wages, fuel, repairs and hauling " in connection with development and drilling." This terminology excludes the idea that any part of such amount was expended in discovery or exploration work or in operating the leased property. Amounts expended in development and drilling operations convey to us the impression of expenditures for improvement of the property upon which the statute permits the taxpayer to deduct depreciation. The adjustment of taxable income will be accomplished by allowing as depreciation the amounts previously treated as depletion allowances upon these expenditures.

At the hearing petitioner's president testified that he had been informed that the officers of the city were without authority to grant it a lease for a term exceeding three years, whereupon respondent amended his answer and alleged that petitioner did not have a depletable interest in the property leased. The lease was granted in April, 1922, for a term of five years and so long thereafter as oil and gas were produced in paying quantities. During all the years

564

involved, 1922, 1923, and 1924, the leases were operated and the city received its share of the oil and gas produced wholly at petitioner's expense. There is nothing in the record which indicates that the city has questioned petitioner's rights, much less that the city has attempted to oust it. Whether the conclusion of the witness, a layman, was or was not sound in law, we have no way of determining from the record. Under these circumstances it would be presumptuous on our part to attempt to decide a question which the city has not raised.

Upon recomputation of the deficiency, respondent's overstatement of petitioner's intangible costs attributable to its city lease should be taken into consideration.

Reviewed by the Board.

*Decision will be entered under Rule 50.*