Portland General Electric Company v. Commissioner.
Portland GE v. Commissioner
Docket No. 5287.
United States Tax Court
1947 Tax Ct. Memo LEXIS 49; 6 T.C.M. (CCH) 1165; T.C.M. (RIA) 47299; October 28, 1947
Clarence D. Phillips, Esq., 805 Electric Bldg., Portland, Ore., for the petitioner. Douglas L. Barnes, Esq., and Wilford H. Payne, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion In its Corporation Income and Excess Profits Tax Return for the calendar year 1939, which was filed with the collector of internal *51 revenue at Portland, Oregon, petitioner deducted the sum of $1,469,171.15 as representing losses due to the abandonment in that year of certain properties owned by the petitioner. Respondent has disallowed this deduction and has determined a deficiency of $112,437.05 in petitioner's income tax for that year. The first issue for decision here is whether petitioner sustained a deductible loss, by abandonment or otherwise, in 1939 with regard to certain undeveloped water power rights owned by it and certain proposed hydro-electric projects on which it or its predecessors had expended substantial sums for preliminary engineering work. If it is determined that petitioner sustained deductible losses with regard to any or all of these assets it will be necessary to determine the amount of loss suffered by petitioner with respect to such assets. Other issues raised by the pleadings have been disposed of by agreement of the parties. This case has been submitted on a stipulation of facts, oral testimony and documentary evidence. The facts stipulated are found to be as stipulated. Findings of Fact Petitioner, Portland General Electric Co., was incorporated under the laws of the State *52 of Oregon and has its principal office in Portland, Oregon. It is the corporate successor of various electric utility companies which have operated in Oregon since about the beginning of the present century. The Portland Railway Light and Power Co., a predecessor of the petitioner, was incorporated in Oregon on June 29, 1906, by a group of Philadelphia and New York bankers (hereinafter referred to as "the bankers") for the purpose of consolidating their holdings of almost all the authorized shares of three Oregon utility companies, which shares had been acquired by the bankers in 1905 and 1906. These three companies were: Portland General Electric Co., incorporated in 1892 (not the present petitioner and hereinafter referred to as the "1892 corporation") Portland Railway Co., incorporated in 1905 (hereinafter referred to as the "1905 corporation") Oregon Water Power & Ry. Co., incorporated in 1902 (hereinafter referred to as the "1902 corporation"). Each of these three companies was the outgrowth of earlier consolidations and mergers of numerous smaller utility enterprises which had operated in Oregon for many years. The name of the Portland Railway Light and Power Co. *53 was changed to Portland Electric Power Co. in 1924 and that corporate name was subsequently changed to Pacific Northwest Public Service Company (hereinafter referred to as "Northwest") in March 1930. The latter corporate name was changed to Portland Electric Power Co. in 1933. The petitioner, Portland General Electric Co., was incorporated on July 28, 1930, and shortly thereafter acquired from Nothwest all of the electric utility properties and certain non-utility properties then owned by the latter corporation. In consideration for these properties petitioner issued all of its capital stock to Northwest. Included in the properties transferred by Northwest were certain hydroelectric projects on the Clackamas River and its tributaries hereinafter described in detail. Also included in the properties transferred were electric utility properties, water rights and real property on both sides of and adjacent to the Willamette River, at above and below the Willamette Falls at Oregon City, Oregon. Northwest also transferred to petitioner as part of its electric utility properties, all of the capital stock of the Clackamas Power and Irrigation Company (hereinafter referred to as the "Clackamas *54 Co.") and this company became a wholly-owned subsidiary of the petitioner. In 1938 the Clackamas Co. was dissolved and all of its properties, including water rights, were transferred upon dissolution to the petitioner. In the year 1939 petitioner owned several hundred acres of riparian land on both sides of the Willamette River at, above and below the Willamette Falls. Petitioner also owned at this location the dam site and the dam across the river, a hydroelectric plant known as Station B and various other installations, rights and improvements, all of which it had acquired through its corporate predecessors. It owned the lands at this location on which were constructed the very large paper-pulp mills of the Crown Zellerbach Corporation (hereinafter referred to as "Crown") and the Hawley Pulp and Paper Co. (hereinafter referred to as "Hawley"). All of these lands were originally acquired by individuals under the Federal Donation Land Act of 1850, before Oregon became a state, and were subsequently acquired by petitioner's predecessors. There has been no change in the ownership of the lands owned by petitioner at this site since petitioner acquired them. The original hydroelectric *55 plant at Willamette Falls was constructed by one of petitioner's predecessors on the East or Oregon City side of the river in about 1889 and was known as Station A. In 1892, Station B was constructed on the opposite, or West Linn, side of the river at the same point. Station A was dismantled at this time and its machinery and equipment was temporarily used in Station B until the new equipment for that station was purchased and installed. The Station A building was later leased to Hawley. Originally the full power capacity of Station B was about 7,200 kw., but for many years the plant has been rated at only about 5,000 kw. The equipment is old and worn and in many ways outmoded. No material changes or additions have been made to that station since 1924. The plant is regarded as only about 40 per cent efficient. Station B is a relatively low-head plant, the waterhead, i.e., the distance which the water falls, normally ranging somewhere between thirty to forty feet. For power purposes this installation is subject to certain major natural difficulties and obstacles. The flow of the river is irregular and there is no storage of any consequence from which the plant may draw. For about *56 five months of the year, June to October, both inclusive, the flow of the river is very low, and for about six or seven months of the year it is relatively high. At times in the Winter months the fall of water (or "head") is nearly obliterated for limited periods by storm or flood conditions when water backs up below the falls; a similar condition may also exist in the Spring or early Summer due to backwater from the Columbia River which reaches a flood stage at that time. Consequently the available "head" for power purposes is frequently limited, and little power can be then obtained for hydroelectric purposes. In dry months, there is normally insufficient water for full utilization of the power facilities of the plant and for the various purposes of the paper mills. Station B is operated to the full extent of its available water supply, depending in part upon the amount of water permitted, under agreements, to be used directly by the paper mills. As owners of the riparian lands on both sides of the river at Willamette Falls, petitioner and its predecessors have claimed the right to use the water as it flows past these lands. A few small water rights at this location owned by others *57 and amounting to about 1,500 horsepower have priority over the rights claimed by petitioner. On the average, the amount of water in the river, expressed in terms of potential horsepower in the available water, varies from about 15,000 horsepower in the dry months of August and September to a high point of about 200,000 horsepower in December and January. Petitioner uses for its own purposes at Station B and leases to others a maximum of 60,000 horsepower when that amount of water is available in the river. Over and above the amount of water used under prior rights, for generation of electricity at Station B and by both paper companies, there is undeveloped water power representing 30,000 or more horsepower at Willamette Falls during seven months of the year, which excess water power has never been utilized by petitioner. Petitioner and its predecessors have carried an item of undeveloped horsepower of water at Oregon City as an asset on their respective books at a value of $900,000. The figure at which this item was thus carried was taken from a valuation of all the properties of petitioner's predecessors made by the OregonPublic Service Commission as of December 31, 1916. On the *58 average, based on records of water flow made over a period of nine years, the amount of water power at Willamette Falls not utilized by petitioner or anyone else, and including the above-mentioned 30,000 horsepower is as follows (expressed in terms of theoretical horsepower): January
144,000 horsepower
February
120,000 horsepower
March
95,000 horsepower
April
66,000 horsepower
May
31,000 horsepower
June to October
none
November
50,000 horsepower
December
141,000 horsepower
The lands on which Crown and Hawley have constructed their paper-pulp mills at Oregon City were leased from petitioner's predecessors under long-term renewable leases. These leases pertain not only to the land but also to the use of waters of the river owned or controlled by petitioner. These leases were entered into by petitioner's predecessors many years ago and bring petitionernet rentals for land and water of about $200,000 per annum. Under the terms of its leases Crown has acquired certain substantial rights with respect to the use of water which are prior to those of petitioner. During the high-water season Crown uses about 35,000 horsepower of water and Hawley about 15,000 *59 horsepower. The paper mills use direct water power for grinding pulp during the high-water months and purchase electrical power from petitioner during the other months for their processing. The water which is allocated to the paper companies by lease must be paid for by them whether they use it or not. Crown is presently constructing a very large new plant at this location but is not planning on purchasing any additional direct water power from petitioner. Except for a small amount of electric energy produced by the paper mills for their own purposes, they purchase their requirements of electrical power from petitioner. The present output of electrical power at Station B is insufficient to meet the requirements of these mills. During the high-water months petitioner's Station B uses about 10,000 horsepower for power generation purposes. For some twenty years prior to 1930 the officers of petitioner and its predecessor had considered, from time to time, the feasibility and advisability of increasing the capacity of the Oregon City installation. Various proposals have been considered with respect to the more efficient use of the water at this site as well as the utilization of the *60 excess (i.e., unused) water available during seven months of the year. The proposals have included one for a new plant to replace Station B and one calling for the installation of modern equipment in Station B and an addition to that plant. These proposals were speculative in character and did not progress from the discussion stage into the blueprint stage of definite plans. There were three general difficulties incident to any proposal for the development of installations at Oregon City: (1) the great variation in the flow of the river from the wet months to the dry months, and in the "head" for power purposes would make any operation at capacity possible during only seven months in the year, with the necessity for using "make-up" power during the balance of the year; (2) during the early part of this speculation, at least, there was an increased efficiency in the use of steam-operated turbines for the production of power, which caused a doubt as to the economy of hydroelectric projects operating on only a part time basis; and (3) the Clackamas River projects were considered to be more economical and efficient in converting water power into electricity. Being a public utility, petitioner *61 had to plan years in advance for expansions in its system to meet additional demands for electric power; up to 1939 the demand had not become strong enough to warrant the expansion of this plant in the face of the difficulties above enumerated. In accordance with the requirements of Oregon law, petitioner has annually filed a statement with the State Engineer of Oregon as to the amount of water power claimed by it at Oregon City. For many years, at least from 1913 to 1934, petitioner and its predecessors claimed the right to use 136,363 theoretical water horsepower at this site. [1] The record does not show that at any time prior to 1934 petitioner was entitled to the use of any less than 136,363 horsepower. Beginning in 1934, petitioner reduced its claims from 136,363 horsepower to 100,000 horsepower. The right to use 100,000 horsepower has been consistently claimed by petitioner from 1934 to and including 1946. Under Oregon law, each claimant of the right to use water power is required to pay "an annual license fee" based upon the theoretical water horsepower claimed. Petitioner and its predecessors have paid these fees, and petitioner itself from 1934 on has paid fees in the annual *62 sum of $5,055 on the basis of 100,000 horsepower. If it had claimed only 70,000 horsepower, its annual fee would have been approximately $1,500 less. As early as 1907 petitioner's predecessors began to plan for extensive development of the hydroelectric resources of the Clackamas River, which river empties into the Willamette River a short distance below Oregon City. The plans for the development of the Clackamas River were not all conceived at one time, but were developed over a period of some twenty years beginning in 1907. The over-all plan for the development of the Clackamas River, the separate components of which were conceived at different times, *63 included the following plants and installations in the following order progressing upstream from the junction of the Clackamas and Willamette Rivers below Oregon City to the headwaters of the Clackamas River in the mountainous sections of Clackamas County: 1. Dam and generating plant at Carver, Oregon, known as the Carver project. 2. Dam and generating plant at Estacada, Oregon (Station M). 3. Dam and generating plant at Cazadero, Oregon (Station G). 4. Dam and generating plant at the junction of the North Fork and the Main Branch of the Clackamas River, known as the North Fork Project. 5. Generating plant at Three Lynks, Oregon (Station P). 6. Diversion of water from Three Lynks Creek to Station P, known as the Three Lynks Diversion Project. 7. Diversion dam at Harriet Lake and pipeline to Station P. 8. Diversion dam and tunnel from the main fork of the Clackamas at Big Bottom, known as the Big Bottom Diversion Project. 9. Storage dam and reservoir at Big Bottom, known as the Big Bottom Reservoir Project. 10. Storage dam and reservoir at Timothy Meadows. Three of the plants listed above, Stations G,M and P, have been placed into operation. Station G at Cazadero *64 was acquired in about 1907 by petitioner's predecessor from the Oregon Water Power and Railway Co., when the plant was almost completed; this plant has an installed generating capacity of 15,250 kw. Station M at Estacada was constructed in 1912, but the last unit was not installed until 1927. The installed generating capacity of Station M is 14,050 kw. Station P at Three Lynks, was originally constructed in 1924 and the last unit was installed in 1931. The plan evolved by petitioner and its predecessors for the hydroelectric development of the Clackamas River contemplated a series of "steps," as necessity required, for installations both above and below the original plants, Stations G,M and P. It was contemplated that all of these installations on the Clackamas would achieve a potential capacity of 100,000 to 120,000 kw. of electricity. The over-all plan was such that all of the plants on the lower part of the river would benefit from power developments in the upper portions of the river. Much of the country in which these proposed hydroelectric developments were to take place was very rugged and accessible only by forest and mountain trails; some areas had never been explored by *65 white men prior to the time that engineering parties sent out by petitioner's predecessors first entered them. All of contemplated installations in the Upper Clackamas region were to be on lands owned by the Federal government. Station P, at Three Lynks, was the first installation made in the development of the Upper Clackamas region and is petitioner's largest plant. It has a theoretical capacity of 80,000 kw, since the installation of the last unit in 1931. Just above Three Lynks, the Clackamas River divides into two forks, known respectively as the Main Branch and the Oak Grove Fork. A ridge separates these forks although the water in each flows in the same general direction. On Oak Grove Fork petitioner's predecessors constructed a dam and created what is known as Harriet Lake. By means of this dam and lake, water is diverted from Oak Grove Fork through a pipeline to Station P; this pipeline is about five miles in length. The Clackamas Co., all of whose capital stock was subsequently acquired by petitioner and all of whose assets were distributed to petitioner in 1938, made various expenditures with respect to a proposed hydroelectric development at the town of Carver on the *66 Clackamas River. It was originally contemplated that a plant should be constructed at Carver, with a 65-foot dam and storage reservoir, to produce approximately 15,000 kw. of power. In 1912 and prior thereto Clackamas Co. expended substantial sums to acquire various water rights at this site from individuals who had filed claims with respect thereto. In 1912 the company sent out engineering parties to this site to do exploratory drilling and excavation work in order to obtain engineering data which would be required for the construction work. Substantially all of the developmental expenditures at the Carver site were made by 1913. From 1914 to 1930 small additional expenditures were made primarily to obtain gauge readings of the water flow at the proposed plant site. In all $100,723.64 were expended by the Clackamas Co. and by petitioner and its predecessors for the acquisition of water rights and in connection with the exploratory and developmental work at Carver. Certain land owned by Clackamas Co. and subsequently by petitioner at this site was sold by petitioner in 1945. At some unknown date a predecessor of petitioner spent a considerable sum of money in exploratory work at *67 a proposed power plant site on the Clackamas River a short distance below the junction of the North Fork of that river with the Main Branch. This project, known as the North Fork Project, was a short distance above the town of Cazadero on the river. In connection with its proposed Oak Grove Project, petitioner had first constructed a road along the Clackamas River to this latter project. [2] Station P was erected as soon as the road reached its site and the road was then extended some five or six miles beyond this station to the dam at Harriet Lake. Due to the rugged terrain, it was found that trucks could not satisfactorily haul supplies over this road, and in the second year of construction at Station P petitioner built a railroad over the road bed, which railroad extended as far as the dam which formed Harriet Lake. This railroad was constructed in about 1923 and ran alongside of the proposed North Fork Project. In 1937 the United States Department of Agriculture, Forest Service, cancelled petitioner's permit for the railroad and directed petitioner to remove the railroad and change the road bed into a highway for public use. Inasmuch as the proposed North Fork development required *68 the construction of a dam, which would have flooded the highway, it became impossible to carry out the North Fork development after petitioner was directed to change the railroad bed to a public highway. The North Fork Project was, therefore, abandoned in 1937. Although the dam would have also destroyed the railroad at North Fork, petitioner had not intended to build the dam until after the railroad was no longer required in connection with the Oak Grove development. Petitioner's predecessor had obtained Permit No. 3802 from the State of Oregon for use of a certain amount of water at North Fork; this permit was cancelled by the State with petitioner's consent in January 1938. Petitioner and its predecessors originally planned a system of related storage reservoirs at the headwaters of the Clackamas in order to control the flow of water to its various hydroelectric installations lower on the river. These reservoirs were all tied in as part of petitioner's proposed 100,000 kw. power development in the Upper Clackamas *69 region. Some of petitioner's rights, particularly at the site of Station P and the proposed reservoir area known as Timothy Meadows, had been acquired by petitioner's predecessor in about 1911 from the Southern Pacific Company which had contemplated extensive electric power developments in connection with a proposed electrification of its railroad system. The amount of "head" or fall of the water in the Upper Clackamas region was very high; at the site of Station P it was almost 900 feet. In 1917 petitioner's predecessor acquired a permit, No. 433, from the State Engineer of Oregon, for a reservoir for the storage of some 40,000 acre feet of water at Timothy Meadows in the headwaters of Oak Grove Fork. This permit was cancelled by the State Engineer in 1919. Petitioner and its predecessors made preliminary expenditures amounting to $32,904.95 in connection with the proposed Timothy Meadows Project; this includes the amounts which had been expended by Southern Pacific Co. and for which petitioner's predecessors had paid Southern Pacific when the latter's rights were acquired. Most of the investigative work by petitioner's predecessor at Timothy Meadows was apparently done during or *70 before 1919, but stream-flow measurements continued until 1936. It was originally intended that the Timothy Meadows Reservoir should serve to regulate the flow of the Oak Grove Fork which provided water for Station P. Timothy Meadows Reservoir would have also benefited petitioner's other hydroelectric plants below Station P on the Clackamas River. In about 1919, petitioner's predecessor contemplated installing a small hydroelectric plant on Three Lynks Creek under a 1,200-foot head. However, in about 1924, when Station P was placed into operation, the initial plan for Three Lynks Creek was abandoned and it was then planned that the water from the Creek should be diverted into the main surge tank above Station P and allowed to mingle with the waters of the Clackamas River to serve the wheels installed in that station. This Creek emptied into the river only about one-half a mile below Station P and petitioner's predecessor constructed a narrow road from the surge tank of Station P to the Creek. $4,614.60 was expended by petitioner and its predecessors with respect to the proposed Three Lynks Creek development. Nothing was done in connection with this project after 1924 or 1925 except *71 to obtain and keep stream-flow records. No state permits were obtained for this project and it was believed that the use of this water was adequately covered, insofar as the Federal government was concerned, by the Federal Power Commission permit pertaining to the Oak Grove or Station P project. The pipeline from Harriet Lake to Station P was originally designed to carry 400 cubic feet of water per second, but experience showed that it could handle as much as 550 cubic feet per second. Inasmuch as Oak Grove Fork at times furnished only 300 cubic feet per second during the low water season, it was determined by petitioner's predecessor that it would be desirable to divert other waters to that pipeline so as to increase the flow through that line, with a resulting increase in the annual production of power at Station P. In this connection consideration was given to diverting water to Oak Grove Fork from the main branch of the Clackamas in an area known as Big Bottom, which was about four miles Southeast of Harriet Lake. The country surrounding this area is very isolated and rugged. Big Bottom itself is a relatively flat area about three-fourths of a mile wide and five to six miles *72 long, located at the foot of the Cascade Range. At about the time that the initial unit at Station P was installed in 1924, petitioner's predecessor conceived a plan for the development of Big Bottom. The first step in the plan called for the digging of a tunnel through the ridge which separated the Main Branch and the Oak Grove Fork, which tunnel was to be about 20,000 feet in length. A relatively low-crib dam was then to be constructed at Big Bottom to divert the waters of the Main Branch through the tunnel to Oak Grove Fork, where the waters would be sent through the pipeline to operate Station P. The second step was to build a high-head dam, about 185 feet high, to create a reservoir for the storage of about 100,000 acre-feet of water; this reservoir, known as Big Bottom Reservoir, would have served to regulate the stream-flow and would have benefited all of petitioner's existing and proposed power plants on the Clackamas River. Consideration was also given to building an additional pipeline to take advantage of all of the water which would be stored. Petitioner's predecessor had preliminary surveys of the Big Bottom area made from 1919 through 1925. In 1926 a permit was obtained *73 from the State of Oregon (No. 8912) allowing the appropriation of waters at Big Bottom for the development of some 42,000 additional horsepower at Station P. This permit applied only to the diversion project. In 1929 petitioner's predecessor applied for a permit, Permit No. R-12571, to construct a reservoir and to store water in it from the Clackamas River. The reservoir permit was cancelled by the State in May 1931. The diversion permit is still in effect and petitioner continues to pay annual fees to the State with respect thereto. In 1931 a contract was entered into for the driving of 3,600 feet of the tunnel through the ridge in connection with the diversion project. This was done at a cost of some $400,000 and this portion of the tunnel was completed in 1932. Petitioner contracted for only 3,600 feet of tunnel because it desired to ascertain the construction problems it would encounter in the project. In 1932, the demand for electric power decreased greatly due to the depression and petitioner did not complete the tunnel. However, petitioner is still considering the possibility of completing the tunnel and the low-crib diversion dam and has not abandoned the diversion project. *74 Petitioner and its predecessors made preliminary expenditures in the amount of $45,665.15 for exploratory work in connection with the Big Bottom Reservoir Project. Most of this sum was spent in 1923 and 1924 and the years prior thereto. The streamflow readings and other tests made at the Big Bottom Reservoir site were of value for either the diversion or reservoir projects. The records of these surveys and tests have been retained by petitioner. The camp buildings erected at Big Bottom in connection with the survey work are still there. Petitioner would have no difficulty in reviving any lapsed permits to use water on the Upper Clackamas, since any successful development of power on the river would have to tie-in with petitioner's existing developments, and no other parties would be likely to apply for permits to use the water. All of the rights to waters of the Clackamas at or above Station P were acquired and claimed by petitioner or its predecessors pursuant to state or Federal appropriation statutes, and are subject to those statutes for their continued use. The Bonneville Dam was completed by the Federal government in about 1937. Between 1937 and 1939, petitioner made efforts *75 to purchase power from the Bonneville Power Administration but these efforts were not successful until 1939. After much negotiation a temporary contract was entered into on December 1, 1939, for the initial purchase of 20,000 kw. of continuous power. Inasmuch as the governmental developments on the Columbia River were multiple purpose dams with only a portion of the cost allocated to power, and were free from taxation, it was possible for Bonneville to produce electric energy at a very low rate. Bonneville accordingly was able to offer to petitioner a rate of $17.50 per kilowatt year for continuous power. The advent of Bonneville Power indicated to petitioner in 1939 that it would be able to purchase power from Bonneville at far less than it would cost petitioner to produce additional power of its own at any of its contemplated power installations and developments in the Upper Clackamas region. In 1939 it became no longer feasible economically for petitioner to continue with or complete the proposed hydroelectric installations and projects known as Timothy Meadows Reservoir, Big Bottom Reservoir, the Three Lynks Diversion Project and the Carver Project. Petitioner is the largest *76 single distributor of Bonneville Power, and purchases about 60 to 70 percent of its power from Bonneville. Due to the advent of aluminum plants in the Northwest, there is a greatly increased demand for power in that area. Petitioner keeps its high-pressure steam plant in standby condition, that is, ready to produce power at a moment's notice; this is necessary to prevent power failures should there be a breakdown elsewhere in petitioner's system. Petitioner is also a member of the Northwest Power Pool, consisting of the Bonneville project and other electric power producers in the Northwest; the members of this group pool their production resources and daily determine the amount of power available and then allocate it according to need. Petitioner endeavors to purchase all the cheap power it can from Bonneville, and thereby reduce its steam plant operations. At the present time petitioner purchases about 130,000 kw of firm or continuous power from Bonneville at a rate of $17.50 per kilowatt year; petitioner also purchases all of the "dump power" which it can use from Bonneville, this being surplus power produced when there is a great deal of water and head in the Columbia River. "Dump *77 power", when available, is purchased by petitioner at a very low rate. In December 1937, pursuant to a resolution of the petitioner's board of directors, a reserve account in the amount of $2,000,000 was set up on the books of the company "to cover losses which may be sustained in connection with the ultimate disposition of non-utility properties and the possible abandonment of properties held for future development." This reserve was created by a charge to capital surplus in the amount of $1,974,128.11, and to earned surplus in the sum of $25,871.89. The capital surplus was created by writing down the total stated value of petitioner's common stock in the amount of $1,974,128.11. The reserve account was designated as "Reserve for Losses Re. Non-Utility Properties and Future Development." According to the resolution providing for this reserve, the "reserve as so created is a fair and reasonable protection against any ultimate losses which may be realized in the disposition of non-utility properties or in the abandonment of properties held for future development." In 1937, after the Department of Agriculture had required petitioner to dig up the construction railroad and replace *78 it with a highway, petitioner wrote-off the North Fork Project. The loss sustained in 1937 in connection with this write-off is not involved as a deduction in this case. On December 28, 1939, the board of directors of petitioner resolved that the projects known as Timothy Meadows Reservoir, the Three Lynks Creek Diversion and the Carver Project should be abandoned as of that date and the amounts expended on those projects be written-off as losses. In December 1939, entries were made on petitioner's books recording the "write-off" as of December 31, 1939, of the following "non-utility properties and expenditures for future development": Utility Plant Held for Future Use
$ 83,184.70
Big Bottom Diversion
$ 45,665.15
Timothy Meadows Reservoir
32,904.95
Three Lynks Diversion
4,614.60
$83,184.70
Other Physical Property - Non-Utility Property Clackamas Power & Irri-
gation Company Project (Carver Project): Land and Development Cost
$100,723.64
Less - Land
17,664.12
$ 83,079.52
Other Physical Property - Undeveloped Water Power Rights (DWP) [3]
$900,000.00
*79 The amounts thus written-off were charged against the "Reserve for Losses re Non-Utility Properties and Expenditures for Future Development." These entries were ratified and approved by petitioner's board of directors at a meeting held on March 12, 1941. In its 1939 tax return petitioner claimed as deductions the following "losses due to abandonments.": Preliminary Expenditures
Re Carver Project
$64,255.00
Re Big Bottom Reservoir
27,856.00
Re Diversion of Three Lynks Creek
2,214.56
Re Timothy Meadows Reservoir
17,012.82
Undeveloped Water Power Rights at Oregon City
$900,000.00
The amounts deducted in petitioner's tax return on account of the first four items above listed, were substantially less than the amounts of the "write-offs" on petitioner's books with respect to the same items. These differences were due to the fact that the amounts written-off on the books included certain items such as interest and taxes which had been deducted as expenses for income tax purposes in earlier years. The amounts charged off on petitioner's books were the total amounts expended by petitioner or its predecessors with respect to the particular projects, but in *80 its 1939 return petitioner deducted only such expenditures as it had capitalized and for which it had not previously received tax deductions. Respondent disallowed these deductions on the grounds stated in the explanation attached to the determination of deficiency, inter alia, that (1) the costs of the properties have not been established and (2) it has not been satisfactorily demonstrated that the properties were, in fact, abandoned during the taxable year 1939, or that any other identifiable event fixing the losses occurred in that year. The stipulation filed by the parties at the time of the hearing stipulated that petitioner, or its predecessor corporations, made preliminary expenditures in connection with the first four projects above listed in amounts equivalent to the amounts claimed as deductions. Petitioner, in 1939, abandoned the Carver, the Three Lynks Diversion and Timothy Meadows Projects and suffered the losses due to abandonments claimed in its 1939 tax return with respect to these particular projects. Petitioner did not, in 1939, abandon the undeveloped 30,000 horsepower at Willamette Falls, Oregon City, and no loss on account thereof is shown to have been sustained *81 by petitioner in the taxable year. In 1939, petitioner abandoned the Big Bottom Reservoir Project, but the amount of loss sustained upon such abandonment can not be determined from the record. Opinion KERN, Judge: In its income tax return for the year 1939, petitioner deducted from its gross income reported the total amount of $1,469,171.15 as "Losses due to abandonments." This amount included the sum of $900,000 alleged to be the cost of certain undeveloped water power rights at Oregon City, Oregon, and also certain sums representing preliminary expenditures made in connection with proposed hydroelectric projects on the Clackamas River and its headwaters. These items of deduction were disallowed by the respondent and are now here at issue. Section 23 (f) of the Internal Revenue Code, under which the deductions were claimed, and the applicable provisions of the Regulations (Sec. 19.23 (e)-3 and 19.23 (f)-1) are set out in the margin. [4]
*82 Since the mere shrinkage in the value of property does not constitute a deductible loss, the general rule is that property must be abandoned or discarded in order to demonstrate its complete worthlessness. Such an abandonment is also an event which is evidence that the loss has been sustained in the taxable period in which the sale or abandonment takes place. Thus, the general rule is that property must be abandoned or permanently discarded in the taxable period in order to show the complete worthlessness of the property as to which a loss is claimed and in order to show that the loss was sustained in that year. Reuben H. Donnelley Co., 26 B.T.A. 107, 116; Boston Molasses Co. v. Commissioner, 155 Fed. (2d) 45; W. B. Davis & Son, Inc., 5 T.C. 1195. Evidence of nonuse is not sufficient to establish the fact of abandonment. Ewald Iron Co., 37 B.T.A. 798; W. B. Davis & Son, Inc., supra.
Assuming arguendo that petitioner's rights to undeveloped water power at Oregon City constituted property separate and apart from the land which it owned there on both sides of the river and as to which a separate loss could be claimed, *83 we are of the opinion that no abandonment of such rights during the taxable year is shown by the record. The parties seem to agree, and the provisions of Oregon Law cited by them indicate, that petitioner as owner of all of the lands on both sides of Willamette Falls has certain vested rights as a riparian owner to the water passing over the Falls. However, its riparian rights do not carry title to the water, title being vested in the public, but only the right to use the water as it flows past petitioner's lands. In order to continue and preserve its right to the use of water at Willamette Falls, petitioner is required to file an annual statement with the State Engineer of Oregon showing the extent of its claim of the right to use water. Furthermore, petitioner is required to pay to the State an annual license fee based upon the theoretical amount of water horsepower claimed. It is specifically provided by the applicable Oregon statute that "the filing of any such claim to water shall be conclusive evidence as to the abandonment by the claimant of all rights to water for power purposes in excess of the claim as filed." [5]
*84 Petitioner has for many years filed the annual statement as to the amount of water power claimed by it at Willamette Falls and has paid the annual license fee based upon the theoretical amount of water power claimed by it at this site. From 1913, if not earlier, to 1934, petitioner and its predecessors claimed the right to use 136,363 theoretical water horsepower at Willamette Falls. In 1934 petitioner reduced its claim from 136,363 horsepower to 100,000 horsepower, the reduction in the amount of horsepower claimed being made in order to save the payment of fees on water which petitioner would never use. To the present, insofar as the record before us reveals, petitioner has continued to claim the right to use 100,000 horsepower and has paid annual license fees based upon this theoretical amount of water horsepower and amounting annually to $5,055. Included in the 100,000 horsepower is the undeveloped 30,000 horsepower allegedly abandoned by petitioner in 1939, but petitioner did not, in 1939, reduce the amount of theoretical water horsepower which it claimed the right to use at Willamette Falls. If it had reduced its claim by 30,000 horsepower it would have saved annually the sum *85 of $1,500. Cf. A. T. Jergins Trust, 22 B.T.A. 551, 561, 562, reversed on another point by 61 Fed. (2d) 92, which was, in turn, reversed by 288 U.S. 508. It is obvious that petitioner did not, in 1939, "abandon" its claim to the undeveloped 30,000 horsepower at Willamette Falls. Nor can it be said that petitioner, in that year, "permanently discarded" the 30,000 horsepower from use in its business or relinquished control over that amount of water horsepower. To the contrary, petitioner took affirmative steps to retain its claim and rights to the water power at Oregon City both developed and undeveloped. Even though it be assumed, for the sake of argument, that the undeveloped 30,000 horsepower at Willamette Falls had but dubious value after the advent of cheap power produced by Bonneville, nonetheless, petitioner has to this day continued to assert its right to use this 30,000 horsepower to the exclusion of all other possible claimants and to make considerable expenditures as prerequisites to such rights. Thus, no other business or person could acquire any right to use this 30,000 horsepower except through petitioner, and then only, in all probability, *86 upon paying petitioner for this right. Petitioner's right to use or to control the use of this undeveloped water power was no less after 1939 than before 1939. The mere "chargeoff" of the asset "undeveloped Water Power Rights (DWP) - $900,000" on petitioner's books in 1939, is not enough to establish that petitioner "permanently discarded" the asset from use in petitioner's business. The facts show that petitioner has continued to hold this asset for whatever it might be worth, and such a hold contradicted any idea of abandonment of this asset in 1939 within the meaning of section 23 (f) of the Code as interpreted by Regulations 103. The question remains whether petitioner may be entitled to claim a loss on account of the complete disappearance of all value whatsoever in the undeveloped water power rights during the taxable year even though petitioner did not abandon these rights in the taxable year. It is true that in some cases involving real estate losses we have held that a sale, abandonment "or other irrevocable loss of title" is not an absolute prerequisite to the deduction of such losses provided it is shown that decisive events occurring in the taxable year have had such *87 an unfavorable effect upon the value of the property involved as to convince us that, from the standpoint of reality "no value whatever remains." W. W. Hoffman, 40 B.T.A. 459, affirmed 117 Fed. (2d) 987; Alice V. Gordon, 46 B.T.A. 1201, affirmed 134 Fed. (2d) 685. It may be pointed out that in both of the above cited cases there were acts of the taxpayer, both of commission and omission, during the taxable years involved, which definitely and beyond cavil evidenced the taxpayers' conviction that the properties involved in those cases were completely devoid of all value, and the facts shown substantiated this conviction. In the instant case the only act of the petitioner in regard to this property during the taxable year (other than a bookkeeping entry) was the reiteration of its claim to the use of the water power alleged here to have been abandoned and the payment of a fee in a not inconsiderable amount to protect its rights as claimed. This act was not only inconsistent with any contention that the rights thus claimed were abandoned, but is also inconsistent with any contention that "no value whatever" remained in these rights *88 after 1939. Cf. A. T. Jergins Trust, supra. In view of the fact that there was no abandonment by the petitioner during the taxable year of the undeveloped water power rights (in spite of the fact that the mechanics of abandonment were provided by statute and had been exercised by petitioner as to 36,363 horsepower in a prior year) and, in further view of the fact that petitioner's contemporaneous actions were inconsistent with its later contention that these rights were wholly worthless in the taxable year, it is proper to require the proof offered by petitioner as to this item to be such as to convince us that those rights had some value at the beginning of the taxable year and during the taxable year lost all value both present and potential. One of the elements of value properly to be considered in appraising the value of the undeveloped water power rights was the possible use of the water power in the generation of electricity. There may well have been other elements of value, such as the use of direct water power or the use of the water for irrigation purposes. We are not convinced by the record (1) that the only value of the undeveloped water power rights arose *89 from its possible use in the generation of electricity, (2) that those rights had any value at the beginning of the taxable year arising from its possible use in the generation of electricity, and (3) that elements of value other than the possible use of the water for electricity were wiped out during the taxable year. We therefore conclude that petitioner has not proved that it sustained a deductible loss during the taxable years arising by reason of events occurring during the taxable year which caused no value whatever to remain in theretofore valuable undeveloped water rights. We have assumed in our consideration of this issue that the undeveloped water power rights here in question constituted property separate and apart from the land owned by petitioner at Oregon City bordering the Willamette River, and that a loss might be claimed as to these rights at a time when the land itself was extremely valuable. We doubt the correctness of this assumption. It may well be, as respondent suggests, that these rights are, or are in the nature of, riparian rights appurtenant to the land itself which continued to be profitably owned by the petitioner on both sides of the river; that these *90 rights constitute only a part of the rights incident to the ownership of the land; and that these rights of ownership can not be separated for the purpose of permitting piecemeal losses to be taken as to one property. See Coalinga-Mohawk Oil Co., 25 B.T.A. 261, affirmed 64 Fed. (2d) 262, cert. den. 290 U.S. 637; Louisiana Land & Exploration Co., 7 T.C. 507
We only express our doubt as to this question since we have already decided the issue as to this item adversely to the petitioner upon well-established principles of Federal tax law and a decision upon a point of Oregon property law is therefore unnecessary. It is also unnecessary, in view of our holding on this issue, to make any finding as to the amount, if any, of petitioner's basis as to the undeveloped water power rights here in question. The next items of deduction here in question relate to preliminary expenditures made by petitioner on its predecessors in connection with proposed hydroelectric projects on the Clackamas River. In its 1939 income tax return petitioner claimed a deductible loss "due to abandonment" in connection with the Big Bottom Reservoir project *91 in the amount of $27,856. On its books in 1939 petitioner "wrote-off" the "Big Bottom Diversion" project in the amount of $45,665.15. This latter sum included certain items such as interest and taxes which petitioner or its predecessors had previously deducted as expense items for income tax purposes in earlier years, and the sum of $27,856 is the portion of $45,665.15 for which tax deductions have not been previously received. At the hearing of this case petitioner's former president testified that the stream-flow readings and other tests made at the Big Bottom Reservoir site were of value for either the diversion or the reservoir projects. Petitioner is still considering the possibility of completing the diversion tunnel at Big Bottom and has not abandoned the diversion project. Since some of the tests made at Big Bottom are of value for the diversion project which may yet be completed, and since we are unable to ascertain from the record what part of the expenditures for such tests should be allocated to the diversion project, respondent's determination that the deduction of the preliminary expenditures pertaining to the Big Bottom Reservoir should be disallowed is sustained. *92 We think that the following amounts deducted by petitioner in its tax return for losses due to abandonment of the following projects should be allowed: Carver
$64,255.00
Diversion of Three Lynks Creek
2,214.56
Timothy Meadows
17,012.82
The losses for which petitioner is seeking a deduction represent moneys stipulated as having been expended for the acquisition of water rights and for surveys, core drilling and preliminary engineering work at these sites. These preparations were of value only if the individual projects involved were actually constructed. Petitioner could recover nothing out of these expenditures for preparations if the construction of the respective projects were abandoned. District Electric Co., 4 T.C. 925. The prospect of cheap power produced by Bonneville indicated to petitioner that it would be economically unwise for it to proceed with the completion of these projects. But it was not until 1939 that petitioner knew definitely that it would be able to purchase power from Bonneville at a price less than the amount it would cost petitioner to produce power at these projects if completed. When cheap power produced by Bonneville *93 became available to petitioner in 1939 under such circumstances as to indicate to it that it would be able to obtainfrom this source all of its future foreseeable requirements for additional power at a price less than its own production cost would be, and the corporate resolution was adopted calling for the abandonment of these projects, the identifiable event occurred which fixes 1939 as the year in which the usefulness of these projects in petitioner's business suddenly terminated. See Empire District Electric Co., supra. Until 1939 it was possible that petitioners would complete these projects and utilize the data which had been obtained by the preliminary surveys conducted with respect to each of them; in 1939 the possibility that this data would be utilized came to an end. The elements required to establish abandonment are present with respect to each of the three projects. Therefore, petitioner should be allowed to deduct in 1939 its losses due to the abandonment of the Carver, Diversion of Three Lynks Creek and Timothy Meadows projects. Decision will be entered under Rule 50. Footnotes
1. According to Title 119. Chapter 3, Sec. 119-302, Oregon Compiled Laws Annotated, the amount of theoretical water horsepower is computed by multiplying the maximum amount of water claimed, expressed in cubic feet per second, by the average total fall utilized, expressed in feet, and dividing the product by 8.8. By the same section it is provided that the filing of the claim to water "shall be conclusive evidence as to the abandonment by the claimant of all rights to water for power purposes in excess of the claim as filed."↩
2. The Oak Grove Project is a general term including Station P, the Three Lynks Creek Diversion Project, Harriet Lake and its dam, and the Big Bottom Diversion Project.↩
3. "Undeveloped Water Power Rights (DWP) - $900,000" referred to the undeveloped horsepower at Oregon City. "DWP" means Direct Water Power.↩
4. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(f) Losses by Corporations. - In the case of a corporation, losses sustained during the taxable year and not compensated for by insurance or otherwise. * * *
REGULATIONS 103: Sec. 19.23 (e)-3. Loss of useful value. - When, through some change in business conditions, the usefulness in the business of some or all of the capital assets is suddenly terminated, so that the taxpayer discontinues the business or discards such assets permanently from use in such business, he may claim as a loss for the year in which he takes such action the difference between the basis * * * and the salvage value of the property. This exception to the rule requiring a sale or other disposition of property in order to establish a loss requires proof of some unforeseen cause by reason of which the property has been prematurely discarded, as, for example, where an increase in the cost or change in the manufacture of any product makes it necessary to abandon such manufacture, to which special machinery is exclusively devoted, or where new legislation directly or indirectly makes the continued profitable use of the property impossible. This exception does not extend to a case where the useful life of property terminates solely as a result of those gradual processes for which depreciation allowances are authorized. * * * * * *
Sec. 19.23 (f)-1. Losses by corporations. - Losses sustained by domestic corporations during the taxable year and not compensated for by insurance or otherwise are deductible in so far as not prohibited or limited by sections 23 (g), 23 (h), 24 (b), 112, 117, 118 and 251↩. The provisions of sections 19.23 (e)-1 to 19.23 (e)-5, inclusive, * * * are in general applicable to corporations as well as individuals. * * *
5. See Oregon Compiled Laws Annotated, 1940, Volume 8 - Water Code, Sec. 116-401, 116-402, 116-403, 116-415, 116-417, 116-419, 116-437, 119-102, 119-301 and 119-302.↩