Estate of A. Gales Johnson, A. Glendon Johnson, Administrator, c.t.a. v. Commissioner.
Estate of Johnson v. Commissioner
Docket No. 61525.
United States Tax Court
T.C. Memo 1958-126; 1958 Tax Ct. Memo LEXIS 101; 17 T.C.M. (CCH) 669; T.C.M. (RIA) 58126; June 30, 1958
*101 KERN Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes for the fiscal years ended August 31, 1951 and 1952 in the amounts of $2,684.83 and $107.78, respectively. Pursuant to section 272(e), Internal Revenue Code of 1939, respondent filed an amended answer in which he made claim for an increase in the deficiency in income tax for the fiscal year ended August 31, 1951, in the amount of $8,362.06. The questions for our decision are: (1) Whether respondent erred in partially disallowing deductions claimed by petitioner for the fiscal year ended August 31, 1951, on account of the obsolescence of certain house plans and the depreciation of remaining plans; and (2) whether respondent erred in partially disallowing petitioner's depreciation deduction for the fiscal year ended August 31, 1952. Findings of Fact The parties have filed herein a stipulation of facts and we incorporate herein by this reference the stipulation, together with the exhibits attached thereto. A. Glendon Johnson, hereinafter referred to as petitioner, is the administrator, c.t.a., of the estate of A. Gales Johnson, hereinafter referred to as the decedent. The *102 fiduciary returns for the years here in question were timely filed with the district director of internal revenue at Baltimore, Maryland. Prior to his death on September 13, 1950, the decedent carried on a business as a sole proprietorship in Washington, D.C., under the name of Standard Homes Company, hereinafter referred to as Standard. The business was a mail-order home plan service based on certain original home designs prepared by the decedent and his staff. Petitioner and his brother, William W. Johnson, were engaged in a business similar to that of Standard before decedent's death. This business was operated in North Carolina. Standard advertised its services in magazines and trade newspapers. As a result of these ads, prospective customers sent for brochures prepared by Standard containing pictures and floor plans of a variety of homes. If the prospective customer chose one particular design, he could order from Standard a kit containing detailed blueprints to be used in the construction of the particular house and a "Material List" booklet containing an itemized list of all materials needed for the construction of the particular house and blank spaces in which "Unit Cost" *103 and "Item Cost" could be noted. There was a standard fee charged for these house kits. The designs for these houses were prepared by architects employed by Standard. The plans were a result of their experience and the features most desired by Standard's customers as expressed in their correspondence. It is difficult to know whether a particular plan will be accepted by the public, and, once accepted, it is difficult to estimate how long it may be profitably used in the business. At the time of decedent's death there were in his possession 115,000 booklets for distribution to the public and 125 original master plans from which the blueprints and material lists which were sold to customers were prepared. The cost of preparing and advertising these plans had been charged to current expenses by the decedent in the year in which the expense had been incurred. The administrator of decedent's estate reported the value of the 125 original plans as being $173,055 in his Second Restated First Account filed in the United States District Court for the District of Columbia holding Probate Court, No. 76,202, and also on the Federal estate tax return filed on behalf of the decedent. There was *104 no ready market for these original master plans. The appraisers who fixed the value for estate tax purposes at $173,055 were of the opinion that the average reproduction cost of the original master plans represented their value as of decedent's death. Upon the basis of decedent's accounting records, they calculated the average reproduction cost of an original master plan and then determined that the reproduction cost of the 125 plans was $173,055, itemized as follows: 464
straight plans
$ 81,200
290
reversed plans
10,150
290
opposite material plans
7,250
116
opposite material reversed plans
3,190
464
material list standard
4,640
12
isometric plans (19 sheets)
30,000
isometric details (16 sheets)
11,000
isometric detail book
10,000
125
design plates
15,625
Total
$173,055
Included in the list of 125 master plans were 25 plans that had been dropped from the current brochures by decedent between 1947 and 1950. Twenty of the 25 plans were dropped in the spring or summer of 1950, only 3 or 4 months before decedent's death. These plans were included in the many brochures in the hands of the public as of the time of decedent's death and *105 were still being ordered at that time. Exclusion of these plans did not mean that orders for them were not fulfilled. During the fiscal years 1950, 1951, 1952, and 1953 receipts from the sale of these 25 plans were $14,300, $4,475, $2,325, and $1,150, respectively. Even after petitioner discovered that these 25 plans, hereinafter referred to as the "dropped" plans, were excluded from the current brochures he retained the valuation of the remaining master plans at the same figure. Thus, the 100 master plans included in the current brochures were listed by petitioner on the fiduciary income tax return as having a value of $173,055. During the fiscal year ended August 31, 1951, petitioner deducted $20,800 as "Obsolescence - Original Plan Designs." This deduction was to cover the value as of decedent's death of 18 plans, hereinafter referred to as the obsolete plans, used in brochures in print at decedent's death which petitioner and the staff of Standard had decided were out of favor with the public on the basis of a decrease in orders therefor and should not be carried in any brochures to be published in the future. Sales of these 18 plans have been made in the following numbers: *106 1950, 477; 1951, 251; 1952-1956, 308. Four of these plans were included in new brochures as alternates for new plans. The floor plans of the 4 models were substantially similar to those of the new models included in the brochure; however, the outside designs were different. Each model in the brochure is illustrated by a 7 1/2- by 5 5/8-inch photograph. In these 4 instances, a 3 1/2- by 2 1/2-inch photograph of the alternate model was also included in the brochure. Sales of these 4 plans have been made in the following numbers: 1950, 126; 1951, 83; 1952-1956, 137. On the fiduciary tax returns petitioner estimated the remaining useful life of the 100 original master plans [1] to be 20 years. On the fiduciary return for the fiscal year 1951 petitioner deducted the sum of $7,612.75 for "Depreciation - original plan design." This amount is 5 per cent of the value of the 125 original master plans ($173,055) reduced by the amount charged off as obsolescence on the 18 original master plans during that year ($20,800). *107 For the fiscal year 1951 respondent made the following adjustments to petitioner's income: ADJUSTMENTS TO NET INCOME
Net income as disclosed by return
$ 11,178.17
Unallowable deductions and addi-
tional income: (a) Depreciation
$ 288.68
(b) Obsolescence
5,876.35
6,165.03
Net income as corrected
$ 17,343.20
EXPLANATION OF ADJUSTMENTS (a) The amount of $288.68 representing an excessive deduction for depreciation is disallowed for the reason that the valuation used for design plates, plans, material lists, etc. was determined to be erroneous. Computation of the adjustment is shown below: Basis used in computing deprecia-
tion on above described assets
$173,055.00
Less: Excess value of 25 orig-
inal designs
$11,659.99
Corrected Obsolescence
14,923.65
26,583.64
Corrected basis for depreciation
$146,471.36
Corrected depreciation (20 year life)
7,324.07
Depreciation claimed on return
7,612.75
Adjustment
$ 288.68
(b) The amount of $5,876.35 representin [representation] an execessive deduction for obsolescence is disallowed for the reason that a portion of the amount so claimed was determined *108 to be attributable to plans and designs still in full use and the balance attributable to the excess value placed on 25 original designs referred to in adjustment (a). The computation is shown below: Excess value of 25 designs
$2,241.35
Value of plans still in full
use
3,635.00
$ 5,876.35
Obsolescence as corrected
$ 14,923.65
Obsolescence as shown on return
20,800.00
Adjustment
$ 5,876.35
The result of these adjustments for the fiscal year 1951 was: (1) To reduce the allowed obsolescence deduction by $5,876.35 representing the remaining value of 4 of the 18 plans allegedly obsolete ($3,635) plus that portion of the value of the 25 "dropped" plans that had been approtioned to these 18 allegedly obsolete plans ($2,241.35); and (2) to reduce the basis of the remaining depreciable plans by $26,583.64 representing the corrected obsolescence deduction ($14,923.65) plus that portion of the value of the 25 unused or "dropped" plans that had been retained by petitioner as a part of the value of the remaining 100 original master plans ($11,659.99). For the fiscal year 1952 respondent made an identical adjustment to the basis of the remaining depreciable *109 plans resulting in a deficiency of $107.78. Opinion KERN, Judge: By an amended answer respondent seeks to disallow the obsolescence deduction previously allowed of $14,923.65, and increase the basis for depreciation accordingly. This would result in an alleged increase in the deficiency for the fiscal year 1951 of $8,362.06. In support of this adjustment respondent alleged: "(d). In the fiduciary income tax returns filed on behalf of this decedent petitioner for the taxable year ended August 31, 1951, there was deducted from gross income $20,800.00 as 'obsolescence' with respect to the afore-mentioned 25 plans. * * *
"(f). There is no evidence in the record before this Court that during the fiscal year ended August 31, 1951, the 25 original home designs, plans and material lists were being affected by economic conditions that would result in their being abandoned at a future date prior to the end of their normal useful life and before their cost basis had been recovered by normal depreciation deductions alone." The first question for our decision is whether petitioner is entitled to a deduction due to obsolescence of certain of the original master plans which were owned *110 by decedent on the date of his death. Before we can answer this question, however, it will be necessary to determine to which group of plans the claimed obsolescence deduction pertains, concerning which respondent appears to be in some confusion. At the time of decedent's death, 125 original master plans were in his possession. Petitioner placed the value of these plans, for estate tax purposes and, later, for depreciation purposes, at $173,055. The issues before us involve two separate groups of plans included in this valuation. After the estate tax return had been filed, petitioner discovered that the first group of plans, numbering 25, was not included in the current brochures sold by Standard but had been eliminated by decedent over the 4-year period preceding his death. For depreciation purposes petitioner chose to apportion the value of these 25 unused or "dropped" plans over the remaining 100 plans, thereby retaining the amount of $173,055 as the basis for depreciation of the 100 plans. The second group of plans, numbering 18, was included in the brochures sold by Standard during the fiscal years 1951 and 1952. Sales of these 18 plans, however, greatly declined during *111 the fiscal year 1951, leading petitioner to believe that these houses had lost favor with the public and were in his opinion obsolete. With the exception of 4 houses which were used as alternates in connection with new plans in later editions of Standard's brochures, it was decided that these 18 plans would be dropped from all of Standard's brochures to be published after 1951. In his notice of deficiency, respondent made two adjustments, one bearing on the claimed depreciation deduction and one bearing on the claimed obsolescence deduction. With respect to obsolescence, respondent decreased the deduction by the "[value] of plans still in full use" and by the "[excess] value of 25 designs." With respect to the depreciation deduction, respondent reduced the depreciable basis of the master plans by the corrected obsolescence and by the "[excess] value of 25 original designs." It is thus apparent that respondent considered that there were two separate groups of plans involved, viz., the 25 "dropped" plans, and the separate 18 "obsolete" plans. However, the amended answer filed by the respondent, as quoted above, erroneously assumes that the obsolescence deduction claimed by petitioner *112 was based on the value of the 25 unused plans which decedent had dropped from the brochures. We come then to the obsolescence issue. In the notice of deficiency respondent disallowed only a part of the claimed deduction for obsolescence. In his amended answer respondent would disallow the entire deduction. The fact that respondent erroneously attributed the obsolescence deduction to the first group of 25 unused or "dropped" plans rather than to the second group of 18 plans does not negate the effect of the amended answer. Even if the reason or theory advanced by the respondent for disallowing a claimed deduction is erroneous, we may still sustain the disallowance if petitioner fails to establish his right to the deduction. Standard Oil Co., 43 B.T.A. 973, affd. 129 Fed. (2d) 363, certiorari denied 317 U.S. 688, rehearing denied 319 U.S. 784; Millar Brainard, 7 T.C. 1180. "Obsolescence is a process, more or less gradual, whereby property, as a result of external causes in contradistinction to deterioration in its physical condition, becomes obsolete by losing its economic usefulness for the purpose for which it was *113 acquired, and by being useless for any other purpose * * *." W. B. Davis & Son, Inc., 5 T.C. 1195, 1217. Among the external causes resulting in obsolescence are such things as changes in the art, loss of trade, inadequacy, supersession, and prohibitory laws. Real Estate Land-Title & Trust Co. v. United States, 309 U.S. 13. The determination of whether or not property has sustained obsolescence is a question of fact. The burden is upon the petitioner to prove that the useful life of the property has been shortened by some external factor which is not compensated for by the normal depreciation allowance. Giles E. Bullock, 26 T.C. 276, affirmed per curiam 253 Fed. (2d) 715. In the instant case petitioner has the burden of proving that respondent erred in reducing the allowance for obsolescence by $5,876.35 in the notice of deficiency. Respondent, by alleging a further deficiency in his amended answer due to disallowance of any deduction for obsolescence, has the burden of proving that the allowed obsolescence of $14,923.65 was erroneous. Petitioner alleges that these 18 plans became obsolete during the fiscal year 1951. In support *114 of this contention, petitioner relies on the decrease in sales figures for these house designs during the fiscal year 1951 and the decision to omit them from future brochures. Petitioner testified that because of the nature of this business the plans were only valuable so long as and to the extent that they evoked public response, that is, so long as detailed blueprints for these particular houses were ordered in appreciable numbers by Standard's customers. According to petitioner's testimony, when a plan fell into public disfavor it lost value to him by reason of obsolescence. Respondent in his original determination accepted the partial obsolescence of these 18 plans but determined that 4 of them were not obsolete in 1951 since they were not dropped from petitioner's later brochures, as were the other 14, but were incorporated in these brochures to serve as alternative exterior designs for newer models. He further adjusted the obsolescence deduction by reducing the basis of the dropped designs by reason of his determination that the value of $173,055 placed upon all of the plans (including the 18 plans claimed to be obsolete in 1951) should have been reduced on account of the partial *115 obsolescence of 25 other plans which had been dropped from decedent's brochures prior to his death. By his amended answer he contends that petitioner is entitled to no deduction on account of obsolescence. After a careful consideration of the record before us, it is our opinion that both the petitioner and the respondent have failed to uphold their respective burdens. It is our opinion, therefore, that the adjusted obsolescence deduction as set forth by respondent in his notice of deficiency is correct. The second question for our decision is whether respondent erred in adjusting petitioner's deduction for depreciation for the fiscal years 1951 and 1952. In his determination respondent accepted the useful life of the original master plans assumed by petitioner. He made adjustments, however, to the depreciable basis used by petitioner as indicated above. After a careful consideration of the entire record herein we conclude that petitioner has failed to uphold his burden of proving that respondent erred in his determination. The determination, therefore, must be sustained. Decision will be entered under Rule 50. Footnotes
1. In the return for the fiscal year ended August 31, 1952, the number was set out as "101 house plans." A count of Exhibits 2-B and 3-C indicates that there were, as captioned on Exhibit 3-C, "125 Estate Designs," including the 25 "dropped" plans.↩